### KATHERINE TODD WATSON v. GEORGE ROBERT CLUTTS.

(Filed 12 June 1964.)

**1. Physicians and Surgeons § 16—**

Where plaintiff's own expert witness testifies from a microscopic examination of plaintiff's thyroid gland after removal that while it was not malignant it was diseased and of a type indicating surgery, plaintiff fails to make out a case upon her contention that defendant surgeon was negligent in employing surgery in her case rather than medication.

**2. Pleadings § 29—**

Allegations contained in a pleading are ordinarily conclusive as against the pleader.

**3. Physicians and Surgeons § 16—**

Plaintiff's contentions, based upon her testimony, that defendant surgeon was negligent in failing to advise her of the nature of the operation and its consequences prior to the operation, cannot prevail in the face of an allegation in plaintiff's complaint that defendant advised plaintiff that the contemplated surgery was serious and was not done without risk.

**4. Physicians and Surgeons § 11—**

Except in emergencies, consent of the patient or someone duly authorized to consent for him is required before a surgeon undertakes an operation. Such consent must be based upon a disclosure of the risks involved of which the surgeon has knowledge and the patient has not, so that the patient may make an informed decision, but the extent of such disclosure must be balanced against the surgeon's primary duty to act in the best interest of the patient.

**5. Physicians and Surgeons § 16—**

Where plaintiff's own expert witness testifies to the effect that the paralysis depriving her of the use of her vocal cords was not due to the cutting of a nerve during the thyroidectomy performed by defendant surgeon, but was due to the natural growth of scar tissue which choked off the blood supply to the nerves, plaintiff's evidence fails to make out a cause of action upon the theory that defendant surgeon negligently severed a nerve during the thyroidectomy.

**6. Physicians and Surgeons § 15—**

Where plaintiff's own expert witness testifies that surgery was indicated in plaintiff's case, and plaintiff's own allegations are to the effect that she was advised that the operation was serious and involved some risk, testimony by plaintiff that she would not have consented to the operation had she been advised that it involved a danger of paralysis of her vocal cords, is properly excluded, since plaintiff will not be permitted to change her decision as to consent in light of conditions after the operation rather than before.

**7. Same—**

The court properly excludes that part of hospital records relating to a second operation indicating that a nerve had been cut in a prior operation when such records were made by a physician other than the surgeon performing the operation and plaintiff's own expert witness who actually performed the second operation testifies that he found no evidence that a nerve had been cut.

**8. Physicians and Surgeons § 16—**

*Res ipsa loquitur* does not apply in malpractice cases and liability must be based on proof of actionable negligence.

APPEAL by plaintiff from *Shaw, J.,* September 23, 1963 Session, GUILFORD Superior Court, Greensboro Division.

The plaintiff instituted this civil action to recover damages for the personal injuries she alleged she suffered as a result of the defendant's

N.C.]        SPRING TERM, 1964.                    155

negligence in performing a subtotal thyroidectomy. At the conclusion of the plaintiff's evidence, the court sustained a demurrer to the evidence and entered judgment dismissing the action. The plaintiff appealed.

*Harry J. O'Connor, Jr., Sapp & Sapp by Armistead W. Sapp for plaintiff appellant.*

*Jordan, Wright, Henson & Nichols, G. Marlin Evans, Hubert E. Seymour, Jr., by G. Marlin Evans for defendant appellee.*

HIGGINS, J. The plaintiff alleged that on September 13, 1960, she became the patient of the defendant, a physician specializing in surgery, having been referred to him by her regular physician, Dr. Merritt. The defendant had the plaintiff admitted to the L. Richardson Memorial Hospital in Greensboro "for examination and probable surgery. Defendant advised the plaintiff that additional studies would be made at the hospital to determine whether surgery was necessary."

The complaint, among other allegations, contained the following:

"VII. While in defendant's office on September 13, 1960, the defendant advised plaintiff that she would have to remain in the hospital approximately a week prior to surgery as this was a serious operation; that the operation was not done without risk, that it was a bigger operation than one would say of an appendectomy or some lesser procedure. No further explanation or description of the operation nor of its possible results was made to plaintiff.

"When plaintiff entered L. Richardson Memorial Hospital and before any tests or examinations were made she was presented and signed a form which contained a written consent for defendant to perform an operation on her.

"On September 26, 1960 at L. Richardson Memorial Hospital the defendant operated on the plaintiff's throat for the purpose of performing a subtotal thyroidectomy. * * *

"During the operation defendant carelessly and negligently severed both recurrent laryngeal nerves which resulted in paralysis of plaintiff's vocal cords on both sides of her throat."

Additional allegations charged that the defendant negligently failed (1) to ascertain that the thyroid gland was not malignant and should have been treated by medication rather than by surgery; (2) to advise the plaintiff of the dangers involved in surgery; (3) to obtain an enlightened consent for the operation; (4) to follow proper surgical procedures in performing the operation, thereby severing the recurrent laryngeal

nerves, causing permanent paralysis of the vocal cords; (5) to evaluate and remedy in so far as possible the injuries resulting from the operation.

The trial consumed almost one week. The record and the briefs are full and complete. The evidence consisted in the main of technical medical testimony and hospital records. In addition, the plaintiff, age 32, testified that in March or April, 1960, she consulted Dr. Fred Merritt, her family physician, because of her nervousness and loss of weight. Dr. Merritt prescribed "thyroid, vitamins, and iodine." This treatment continued, except for a short interval, until September when Dr. Merritt advised, "That I was able to take the operation . . . and he sent me to Dr. Clutts. . . . After examination, Dr. Clutts said, 'There's thyroid there . . . that it should be removed . . . He told me that I would have to remain in the hospital a week before the operation in order to run some tests." Dr. Merritt checked the charts on Thursday. "Dr. Clutts . . . asked me was I ready for the operation. I told him, 'Yes.' He said, . . .'We will do it on Monday and after this operation you will feel like you are 16 again.' At no time while I was in the hospital did Dr. Clutts make any further statement to me as to the nature of the operation and its probable consequences."

"I talked to Dr. Clutts about my condition the next morning (after the operation) and he said that he had run up on a little difficulty and said that my thyroid was wrapped around my vocal cord and that was the condition he found. . . . He said it was nothing to worry about, that it would be all right."

The plaintiff further testified as to the hoarseness, difficulty in breathing and in talking, beginning immediately after the operation and continuing, although she returned to work for a few months. After consulting with Dr. Clutts a number of times, she returned to Dr. Merritt for treatment. Thereafter, she consulted with Dr. Shahane Taylor who sent her to the Memorial Hospital in Chapel Hill where she submitted to a tracheotomy.

Dr. Groat, pathologist at the Richardson Memorial Hospital in Greensboro, made a microscopic examination of the thyroid tissues (removed by the operation). Diagnosis, "Diffuse hyperplasia of the thyroid," and "Parathyroid gland . . . there was no malignancy in this tissue. . . . The gland I examined which came from the patient was diseased. . . . This is the type of thyroid gland that is removed surgically. This is generally done when a patient does come under the care of a physician who finds the condition of thyrotoxicosis, so this is a type of gland which is frequently removed in such case . . . a disease of the thyroid gland in which a gland oversecretes thyroxine or . . . If a patient has that type condition and nothing is done about it, no treatment is given, it may well be fatal sooner or later." * * *

"The vocal cords in relation to the thyroid gland and the larynx or voice box, are in the interior, the interior of the larynx, interior of the upper part of the larynx. Inside the upper part of the larynx. The vocal cords run horizontal from front to back. They consist in part of muscle, which is the interior of the vocal cords. They are covered over by some other types of tissue on the outside. Immediately covering the vocal cords, there is a type of tissue called the connective tissue. Immediately over that, there is a type of tissue lying on the surface of the vocal cords called epithelium. The vocal cords which run from front to back of the throat inside the upper part of the voice box or larynx, open and close. When you breathe in, when you inhale, the cords are open. When you speak, the vocal cords open and close, or go through the motions of what we doctors call abduction and adduction, very rapidly — vibrate. They vibrate at very high speed, and as you speak, that vibration is going on in your vocal cords all the time, but of course, you are not conscious of it . . . While I was making this examination of this tissue, the results of which are covered in my report, Plaintiff's Exhibit 5, during either the gross or microscopic examination, I did not discover the presence of any nerve tissue."

Plaintiff's witness, Dr. Lusk, testified: "There are three basic treatments for an overactive thyroid gland. There is drug treatment. There is radioactive iodine treatment, and there is surgery. . . .

"Now, all three are used and must be used in different conditions. For instance, we generally prefer drug treatment for children and preparation for surgery. Radioactive iodine treatment is x-ray, and we generally reserve that for an older age person or the poor risk patient, or those with a diffuse goiter, who may have exophthalmos, prominence of the eyes.

"Surgery is generally reserved for the younger patient, who is too young to be exposed to the radiation of radioactive iodine or who has a large gland, and, of course, surgery is also reserved for those in which there is any question of cancer. If there is any question of cancer, surgery, of course, becomes the immediate form of treatment, so we have basically three forms of treatment for thyroid, and we have to use our judgment in regards to the patient, each individual, as to which is going to be the best treatment for this patient."

The records from Memorial Hospital at Chapel Hill contain these entries: " 'Section of recurrent laryngeal nerve secondary to thyroidectomy bilateral,' and the words in item 3 on that page, 'due to lesion of nerve.'

" 'Bilateral paralysis of the vocal cords,' these words in quote and enclosed in brackets, 'following surgical trauma to the recurrent laryngeal nerve on each side,' . . . 'due to lesion of nerve'."

Dr. Shahane Taylor of Greensboro, a specialist in otolaryngology, and a plaintiff's witness, testified:

"My examination revealed a complete abductor paralysis of the vocal cords. The abductors of the larynx are muscles which pull the vocal cords apart. When you take a deep breath, your abductor muscles pull your vocal cords apart so you can breathe. I found a complete paralysis of the abductor muscles on both sides. * * *

"I believe that had this girl had an abductor paralysis, she would have had to have had the tracheotomy before she did have it. I don't believe she could have gone that long, and that is my opinion, and the only thing that I know of — talking about fibrous tissue, the only thing that I know of that came on here to cause this delayed paralysis of this larynx is fibrosis from healing, which we all know is one of nature's processes of healing. Fibrosis, formation of scar tissue in healing, it's all the same. All of us heal in scar tissue."

In reviewing a week-long trial in which most of the evidence came from medical experts and from hospital records, the Court necessarily must confine the factual recitals to those matters which bear directly on the questions of law presented by the appeal. To begin with, the plaintiff concedes the defendant possessed the necessary qualifications to permit him, as a surgeon, to accept the plaintiff as his patient and to undertake the diagnosis and treatment of her thyroid involvement. She also concedes he is a specialist in surgery. Her family physician, Dr. Merritt, after diagnosis and treatment for several months, advised surgery, and he referred her to the defendant for the operation. The defendant arranged for her admission to the Richardson Memorial Hospital in Greensboro for further tests and preparation for surgery if required. She signed a proper authorization for the operation.

Notwithstanding this background, the plaintiff alleged the defendant was negligent in that he should have discovered her thyroid condition was nonmalignant and should have treated her by medication rather than by surgery. Not only did the plaintiff fail to offer medical evidence in support of this contention, but her own expert witness, Dr. Foust, testified he made a microscopic examination of the gland after removal, and while it was nonmalignant, nevertheless it was diseased. "This is the type of tryroid that is removed surgically." The plaintiff's witness, Dr. Lusk, testified she is in the category indicating surgery. The decision to operate, therefore, is supported by the plaintiff's own evidence. Negligence in the decision to operate is not disclosed.

The plaintiff next contends her consent to the operation was obtained because of the defendant's negligent failure to advise her of the "nature

of the operation and its probable consequences." She so testified. However, in paragraph VII of the complaint she alleged the defendant advised the plaintiff that she would have to remain in the hospital approximately a week prior to surgery as this was a serious operation; that the operation was not done without risk. The plaintiff is bound by that allegation. "A party is bound by his pleadings and, unless withdrawn, amended, or otherwise altered, the allegations contained in all pleadings ordinarily are conclusive as against the pleader." *Davis v. Rigsby,* 261 N.C. 684. The plaintiff's testimony that she was not advised of danger must give way to the judicial admission contained in her complaint. In addition, she knew her family physician had advised, and for months had been preparing her for, a thyroidectomy. He checked her chart before the operation.

Courts have expressed widely divergent views as to how far the surgeon should go in advising of dangers involved in a proposed operation. Plaintiff insists this Court should take the extreme view expressed in *Salga v. Leland Stanford Jr. University Board of Trustees,* 154 Cal. App. 2d 560, 317 P. 2d 170: "A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent." See, also, 40 Minn. Law Review 876.

Of course, the type of risk involved should have bearing on the completeness of the disclosure required. Obviously, brain or heart surgery involves high risks. Removal of an ingrown toe-nail ordinarily does not. However, a surgeon, except in emergency, should make a reasonable disclosure of the risk involved in a proposed surgical operation if the operation involves known risk. And yet, to send a patient to the operating room nervous from fright is not often desirable. The middle ground rule is admirably stated in 75 Harvard Law Review 1445: "The duty narrows then, in the average case, to disclosure of dangers peculiar to the treatment proposed and of which it is likely that the patient is unaware. The doctor should have little difficulty in choosing from these the risks that are sufficiently serious and likely to occur as to be essential to an intelligent decision by his patient."

Difficulty arises in attempting to state any hard and fast rule as to the extent of the disclosure required. The doctor's primary duty is to do what is best for the patient. Any conflict between this duty and that of a frightening disclosure ordinarily should be resolved in favor of the primary duty. And yet, the consent of the patient or of someone duly authorized to consent for him, except in emergencies, is required before the operation is undertaken. The surgeon should disclose danger of which he has knowledge and the patient does not — but should have — in order to determine whether to consent to the risk.

In this instance the defendant, according to the plaintiff's judicial admission, was advised the operation was serious and involved risk. For months Dr. Merritt had been preparing her for surgery. If, in order to withdraw her written consent, she desired to be further advised, a simple request would have disclosed the surgeon's view as to adverse possibilities. The claim of defendant's failure to advise the patient that the proposed operation was serious and involved risk is not sustained.

Does the evidence disclose negligence in performing the operation? The plaintiff's pathologist made a microscopic examination of the gland after removal. "I did not discover the presence of any nerve tissue." Plaintiff's witness, Dr. Taylor, gave as his opinion that if the nerve had been severed by the operation, paralysis would have been immediate, and a tracheotomy would have .been required. The delayed paralysis, in his opinion, resulted from the formation of scar tissue developed in the healing process. This view appears to be strengthened by the plaintiff's evidence that on the day following the operation the defendant told her he ran into some difficulty during the operation and that the gland had wrapped itself· around the vocal cord. Hospital records at Chapel Hill disclose heavy scar tissue was encountered in the tracheotomy. The evidence is insufficient to disclose negligence in the surgical procedure followed by the defendant in this case. Either of two operative procedures has its advocates among surgeons. See *DiFilippo v. Preston,* 173 A. 2d 333 (Supreme Court of Delaware, decided June 29, 1961).

The evidence offered at the trial indicates that the slow process involved in scar tissue formation following the operation finally choked off the flow of blood to the nerves which supply the motor power for the vocal cords, causing paralysis. Plaintiff's evidence fails to show the paralysis resulted from a severance of the nerves during the operation. This view is supported by the plaintiff's own evidence. After the operation at Richardson Hospital in Greensboro in September, 1960, and before the tracheotomy in Memorial Hospital at Chapel Hill in November, 1961, the plaintiff was treated by her regular physician, Dr. Merritt. She did not call him as a witness.

The plaintiff attempted to testify that if the defendant had advised her the operation might involve paralysis of the vocal cords she would have withdrawn her consent. The court excluded this testimony which presented a case of looking backward. Perhaps the defendant with the benefit of a backward look would not have performed the operation; but at the time decision was made to operate the surgeon was dealing with a patient who had a diseased gland which failed to secrete the proper amount of hormone. The medical experts, plaintiff's witnesses, say surgery in such event is indicated. All cutting operations involve some risks. Possible

dangers of an operation had to be balanced against the certain danger of a diseased thyroid. Decision had to be made before the operation. To permit the plaintiff to change the decision afterwards is equivalent to looking at the answer without solving the problem.

The court, over objection, admitted in evidence certain entries made in the hospital records at Chapel Hill, including the following: "Diagnosis: paralysis of vocal cords (due to nerve lesions) . . . secondary to thyroidectomy bilateral . . . (due to nerve lesions)." These entries were made by Dr. Haywood, then serving his first year as assistant resident physician. Later in the record Dr. Haywood repeated in substance this diagnosis. At the time of these entries, Dr. John W. Foust was resident physician and in overall charge of the patient and the records. He actually initialed them as approved.

Dr. Foust and Dr. Mason performed the tracheotomy. Dr. Foust testified: ". . . (T)he first diagnosis that is listed here is one that I don't think can be made on the basis of studies that have been made on the patient while at Chapel Hill. . . . I would interpret this diagnosis to mean that the nerve had been sectioned, which means cut, . . . From the information we have in this chart, we have no evidence that a nerve has been cut." On the basis of the foregoing testimony of the plaintiff's witness, Dr. Foust, the court withdrew from the jury that part of Dr. Haywood's diagnosis enclosed in parenthesis. If the plaintiff's own evidence shows that Dr. Haywood did not have sufficient basis for the opinion he expressed in the hospital records, and in fact without a showing of his having made any tests, or his qualification to make them, the exclusion was not error.

The decisions of this Court generally hold that liability in malpractice cases must be based on proof of actionable negligence. The doctrine *res ipsa loquitur* cannot be relied on to supply deficiencies in the proof. *Hunt v. Bradshaw*, 242 N.C. 517, 88 S.E. 2d 762; *Hawkins v. McCain*, 239 N.C. 160, 79 S.E. 2d 493; *Grier v. Phillips*, 230 N.C. 672, 55 S.E. 2d 485; *Smith v. Wharton*, 199 N.C. 246, 154 S.E. 12.

After careful review of all assignments of error, we conclude the demurrer to the evidence was properly sustained.

Affirmed.