JANET CHRISTINE McPHERSON v. GUY T. ELLIS

No. 147A81

(Filed 3 March 1982)

1. **Physicians and Surgeons §§ 11.1, 17.1— remoteness of risks in procedure— standard among profession—instructions improper**

   The trial court erred in instructing the jury in a malpractice case to consider the remoteness of the risks of paralysis resulting from arteriogram procedures and to determine whether relating such a risk was required under the standard of medical practice in the professions of neurology and neuroradiology since the uncontraverted evidence indicated that the standard of care required advisal of the risks of paralysis.

2. **Physicians and Surgeons § 17.1— informed consent—responsibility of doctors —instructions improper**

   The trial court erred in instructing the jury that it could find that the responsibility of informing the plaintiff was solely that of one doctor where the uncontraverted evidence tended to show that another doctor had a duty to explain the risks of paralysis to a prospective arteriogram subject.

3. **Physicians and Surgeons § 17.1— informed consent—proximate causation—instructions proper**

   The trial court in an informed consent case properly instructed the jury that it should consider what the patient's decision would have been had she been properly informed of the risks of paralysis in arteriogram procedures. The subjective test, as opposed to the objective test, is the proper standard to apply in determining whether a patient would have undergone treatment had he known the risks the physicians neglected to relate to him.

THE plaintiff petitioned for discretionary review of the decision of the North Carolina Court of Appeals reported at 53 N.C. App. 476, 281 S.E. 2d 94 (1981) affirming the judgment entered by *Thornburg, J.*, in accordance with the jury verdict rendered at 8 February 1980 Civil Session, BUNCOMBE Superior Court. The petition was allowed 3 November 1981.

The plaintiff originally brought this negligence action for medical malpractice against Dr. John Ledbetter, a neurologist, and Dr. Guy T. Ellis, a radiologist. She alleged that they had failed to warn her of the risk of paralysis before obtaining her consent to perform a radiological diagnostic procedure known as an arteriogram.

During the spring of 1975, Janet McPherson was an athletic, healthy, college freshman, proficient at horseback riding, swim-

ming and riflery. She was often plagued by severe headaches, a recurrent ailment extending back approximately to her twelfth birthday in 1968. At that time, she had undergone surgery to implant a shunt inside her cranium. This surgical implant drained fluid from her head into the lower portion of her body and successfully alleviated her headaches for a year. In 1969, she suffered a concussion in a bicycle accident which resulted in the resumption of headaches.

Late in 1974, she consulted Dr. John W. Ledbetter, the physician who had recommended her original surgical implant in 1968. As a result of Dr. Ledbetter's diagnosis and unsuccessful attempts to allay the headaches by medication, she entered St. Joseph's Hospital on 2 March 1975 for a brain scan and an arteriogram.

The brain scan, performed on 3 March 1975, indicated the presence of a mass around her brain. Dr. Ledbetter, a neurologist, explained to Ms. McPherson that she possibly had a subdural hematoma, but that his diagnosis could not be definite until the arteriogram was administered. Dr. Ledbetter advised her that the procedure for the arteriogram involved invading the body and injecting a foreign substance; therefore, some degree of risk was involved. Dr. Ledbetter never informed Ms. McPherson of any specific risk of paralysis. The defendant, Dr. Guy T. Ellis, came by Ms. McPherson's hospital room on the evening of 3 March 1975. Dr. Ellis, the neuroradiologist who was to perform the arteriogram, explained the procedure to Ms. McPherson. He advised her that an arteriogram is a special x-ray for examining blood vessels. A contrast material is introduced into the blood vessels through a catheter placed in an artery in the groin area and the blood vessels are studied by television monitor in an adjoining room.

Dr. Ellis warned her that the arteriogram involved the risk of a blood clot at the site of the catheter entry and the possibility of severe headaches following the operation. Dr. Ellis testified that he advised Ms. McPherson that there was a 1 in 500 chance of "severe complication or permanent neurologic deficit" (meaning blindness or paralysis); Ms. McPherson testified that he did not so advise her.

Ms. McPherson became concerned about the risk of blood clots and headaches and expressed her doubts to her mother. She considered the possibility of cancelling the operation, but agreed to wait until again speaking with Dr. Ledbetter. Dr. Ledbetter assuaged her fears by assuring her that the risk of blood clots existed primarily in older people with circulatory problems and that any possible headaches would disappear if she lay down after the procedure was completed. She thereupon agreed to submit to the arteriogram by signing a consent form provided by the hospital.

The arteriogram was performed on 4 March 1975. During the course of the operation, Ms. McPherson felt hot flashes and went blind. Dr. Ellis said, "Don't worry about it; it is the result of the dye. It will pass." She did not regain her vision during the operation, however. He continued with the procedure, and she felt a shove in the back of her neck. Suddenly, her arms, legs and trunk became paralyzed.

Ms. McPherson is now permanently paralyzed over 45% of her entire body, with a 40% disability of her upper extremities and a 5% disability of her lower extremities.

The plaintiff, Ms. McPherson, brought suit against Dr. Ledbetter and Dr. Ellis, for their alleged negligent failure to inform her of the full extent of the risks of the arteriogram procedure. The jury found in favor of each defendant. Plaintiff submitted to a voluntary dismissal of her claim against Dr. Ledbetter, and appealed from the judgment entered in favor of Dr. Ellis.

The North Carolina Court of Appeals affirmed the judgment entered by the trial court in accordance with the jury's verdict.

*Wade and Carmichael, by J. J. Wade, Jr. and R. C. Carmichael, Jr., Attorneys for plaintiff-appellant.*

*Harrell and Leake, by Larry Leake, Attorney for defendant-appellee.*

MITCHELL, Justice.

[1] The plaintiff first assigns as error the Court of Appeals' holding that the trial court properly instructed the jury that it could consider the relative percentage chance of paralysis in

determining whether Dr. Ellis had the duty to inform the plaintiff of the risk of paralysis when all of the medical expert testimony indicated that Dr. Ellis did have such a duty.[1]

1. Effective 1 July 1976, the General Assembly enacted specific legislation, codified as G.S. 90-21.13, which controls in cases involving informed consent to health care treatment or procedures on or after that date. 1975, 2nd Sess. c. 977, s. 4. Several of the principles set forth in this opinion are superseded by this statute which states in its entirety the following:

§ 90-21.13. *Informed consent to health care treatment or procedure.—*

(a) No recovery shall be allowed against any health care provider upon the grounds that the health care treatment was rendered without the informed consent of the patient or the patient's spouse, parent, guardian, nearest relative or other person authorized to give consent for the patient where:

(1) The action of the health care provider in obtaining the consent of the patient or other person authorized to give consent for the patient was in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities; and

(2) A reasonable person, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatments which are recognized and followed by other health care providers engaged in the same field of practice in the same or similar communities; or

(3) A reasonable person, under all the surrounding circumstances, would have undergone such treatment or procedure had he been advised by the health care provider in accordance with the provisions of subdivisions (1) and (2) of this subsection.

(b) A consent which is evidenced in writing and which meets the foregoing standards, and which is signed by the patient or other authorized person, shall be presumed to be a valid consent. This presumption, however, may be subject to rebuttal only upon proof that such consent was obtained by fraud, deception or misrepresentation of a material fact.

(c) A valid consent is one which is given by a person who under all the surrounding circumstances is mentally and physically competent to give consent.

(d) No action may be maintained against any health care provider upon any guarantee, warranty or assurance as to the result of any medical, surgical or diagnostic procedure or treatment unless the guarantee, warranty or assurance, or some note or memorandum thereof, shall be in writing and signed by the provider or by some other person authorized to act for or on behalf of such provider.

(e) In the event of any conflict between the provisions of this section and those of Article 7 of Chapter 35 and Articles 1A and 19 of Chapter 90, the provisions of those Articles shall control and continue in full force and effect. (1975, 2nd Sess., c. 977, s. 4.)

A physician or surgeon who undertakes to render professional services must possess the degree of professional learning, skill and ability which others similarly situated ordinarily possess; he must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case; and he must use his best judgment in the treatment and care of his patient. *Hunt v. Bradshaw*, 242 N.C. 517, 88 S.E. 2d 762 (1955). He is held to the standard of professional competence and care customary in similar communities among physicians engaged in his field of practice. *Dickens v. Everhart*, 284 N.C. 95, 199 S.E. 2d 440 (1973).

Adherence to a minimal standard of care ordinarily requires a physician or surgeon to secure consent of an individual before providing him treatment. Consent to a proposed medical procedure is meaningless if given without adequate information and understanding of the risks involved. Therefore, the standard of professional competence prescribes that a physician or surgeon properly apprise a potential patient of the risks of a particular treatment before obtaining his consent.

The seminal case requiring a physician to obtain his patient's "informed consent" is *Salgo v. Leland Stanford, Jr. University Board of Trustees*, 154 Cal. App. 2d 560, 317 P. 2d 170 (1957). There the court held that a physician "violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment." *Id.* at 578, 317 P. 2d at 181.

A major issue in informed consent cases is whether a plaintiff must present expert medical testimony to establish the existence and scope of a physician's duty to disclose risks of a proposed treatment. *See* Annot., 52 A.L.R. 3d 1084 (1973). The Court of Appeals apparently proceeded under the theory that such testimony is not required when it concluded that, "We believe with this information [the mathematical probability of paralysis resulting from an arteriogram] laymen are capable of determining whether good medical practice requires a physician to inform his patient of the possibility of paralysis as a result of an arteriogram." 53 N.C. App. at 479, 281 S.E. 2d at 96. The determination of this issue is not essential to the resolution of this case; therefore, we express no opinion as to the merits of the Court of Appeals' *sub silentio* decision.

The question of the necessity of expert testimony need not be reached in this case because seven medical experts in fact expressed their opinions on the duty to advise a patient of the risk of paralysis in an arteriogram procedure. These witnesses, experts in the fields of neurology, neurological surgery, or radiology, all testified that the standard of good medical practice in Buncombe County in March, 1975 would be met by explaining to an arteriogram patient the risks of paralysis. Three witnesses, including the defendant Dr. Ellis, testified that failure to advise of the risks of paralysis would not conform to such standards of medical practice. No witnesses testified that failure to advise of the risks of paralysis was consistent with good medical practice in Buncombe County in March, 1975.

The expert medical witnesses based their opinions, in part, on evidence of the incidence of paralysis resulting from arteriogram procedures. Defendant contends, and the Court of Appeals held, that the chance of paralysis, approximately 1 in 500, in itself was evidence from which a jury could determine whether good medical practice required advisal of the risk. We disagree. Evidence of the remoteness of a particular risk, mathematically expressed as a ratio or percentage, is not sufficient, standing alone, to permit a jury to establish independently a standard of care for advisal of that risk in the face of uncontroverted expert medical testimony as to the existence and scope of the physician's duty. *Cf. Starnes v. Taylor*, 272 N.C. 386, 158 S.E. 2d 339 (1968) (remoteness of the risk considered in the absence of expert medical testimony as to the proper standard).

The trial court therefore erred in instructing the jury to consider the remoteness of the risk of paralysis and to determine whether relating such a risk was required under the standard of medical practice in the professions of neurology and neuroradiology in March, 1975 in Asheville or similar communities. The uncontroverted evidence indicated that the standard of care required advisal of the risk of paralysis. "When all the evidence offered suffices, if true, to establish the controverted fact, the court may give a peremptory instruction—that is, if the jury find the facts to be as all the evidence tends to show, it will answer the inquiry in an indicated manner." *Chisholm v. Hall*, 255 N.C. 374, 376, 121 S.E. 2d 726, 728 (1961). The trial court should have instructed the jury that if it found that the standard of

medical practice in the professions of neurology and neuroradiology in March, 1975 in Asheville or similar communities required that an individual undergoing an arteriogram be advised of the risk of paralysis, *as all the evidence tended to show*, failure to adhere to that standard would result in civil liability.

[2] The plaintiff next assigns as error the instructions of the trial court that if the jury found that the referring neurologist Dr. Ledbetter had the sole responsibility of informing plaintiff of the risk of paralysis, then they should find Dr. Ellis not liable to the plaintiff. The instruction was not supported by the evidence. No witness testified that Dr. Ledbetter had the *sole* responsibility of advising plaintiff of the risks. It was at most his primary responsibility. The uncontroverted evidence tended to show, if the jury chose to believe it, that Dr. Ellis had a duty to explain the risks of paralysis to a prospective arteriogram subject. Therefore, the trial court erred in instructing the jury that it could find that the responsibility of informing the plaintiff was solely that of Dr. Ledbetter.

[3] The plaintiff's third assignment of error stems from the trial court's instruction that if the jury found Dr. Ellis had not properly informed the plaintiff of the risk of paralysis, she still would not be entitled to recover if they also found that, had she been so informed, she would nevertheless have consented to the arteriogram. A requisite of a cause of action for negligence is that the alleged negligent act or omission by the defendant be the proximate cause of the injury. *Meyer v. McCarley & Co., Inc.*, 288 N.C. 62, 215 S.E. 2d 583 (1975). If the plaintiff would have consented even after being apprised of all the facts, the failure to inform her was not a cause in fact of her undergoing the operation, and was thus not a cause of her injury. Therefore, the jury was properly instructed that it should consider what her decision would have been had she been properly informed of the risk of paralysis.

A major issue in informed consent cases is what standard to use in determining proximate causation. Note, *Informed Consent—A Proposed Standard for Medical Disclosure*, 48 N.Y.U.L. REV. 548 (1973). A subjective standard requires the jury to determine whether, if informed, this particular patient would have foregone treatment. *Id.* at 550. An objective standard requires the

McPherson v. Ellis

jury to determine whether, if informed, a reasonable, prudent person under all the surrounding circumstances would have foregone treatment. *Id.*

The problem with a subjective standard is that the only evidence usually available is the plaintiff's bald assertion, tempered by hindsight, as to what he would have done had he known all the facts. The apparent inequity of a jury basing its decision solely on such testimony has troubled courts, once even to the extreme of excluding the plaintiff's testimony on this issue. *Watson v. Clutts*, 262 N.C. 153, 160-61, 136 S.E. 2d 617, 622 (1964).

The detriments of the objective standard are more severe, however.[2] In determining liability by whether a reasonable person would have submitted to treatment had he known of the risk that the defendant failed to relate, no consideration is given to the peculiar quirks and idiosyncracies of the individual. His supposedly inviolable right to decide for himself what is to be done with his body is made subject to a standard set by others. The right to base one's consent on proper information is effectively vitiated for those with fears, apprehensions, religious beliefs, or superstitions outside the mainstream of society.

Therefore, we hold that the subjective test is the proper standard to apply in determining whether a patient would have undergone treatment had he known of the risks the physician neglected to related to him. To the extent that *Watson v. Clutts*, 262 N.C. 153, 136 S.E. 2d 617 (1964) conflicts with this decision by requiring exclusion of a patient's testimony as to what he would have done had he known of the risks, that case is disapproved. The trial court properly instructed the jury that it should consider whether Ms. McPherson would have undergone the arteriogram had she known of the risk of paralysis.

Remanded to the Court of Appeals for further remand to Buncombe Superior Court for a

New trial.

---

2. G.S. 90-21.13(a)(3) requires that the objective standard be applied to claims arising on or after 1 July 1976.