DAVID WAYNE DIXON v. CALVIN R. PETERS AND DUKE UNIVERSITY

No. 8214SC754

(Filed 6 September 1983)

**1. Constitutional Law § 6; Physicians, Surgeons and Allied Professions § 17.1— informed consent statute—no legislative infringement on judicial power**

G.S. 90-21.13(a)(3), which deals with informed consent to health care treatment, is not unconstitutional as a legislative infringement on the judicial power delegated to the courts by Art. IV, § 1 of the North Carolina Constitution. Proof of causation in a malpractice action is an evidentiary matter, and the legislature's decision to legislate in this area is not an infringement of the judicial powers of the state courts.

**2. Physicians, Surgeons and Allied Professions § 17.1— informed consent cases—objective standard for determining proximate cause proper**

Using an objective (reasonable person) standard, rather than a subjective (personal) standard, for determining proximate cause in informed consent cases does not violate the substantive due process rights under both the North Carolina and the United States Constitutions.

**3. Physicians, Surgeons and Allied Professions § 17.1— standard of review for informed consent statute**

The standard of review for cases arising under the informed consent statute is not the middle tier/substantial state interest constitutional test. Rather the constitutional test for the informed consent statute is the lower tier/rational basis/legitimate state interest test, and there is a rational basis for the promulgation of G.S. 90-21.13.

**4. Physicians, Surgeons and Allied Professions § 15— sustaining of objection to testimony not reversible error**

The trial court did not commit reversible error by sustaining an objection to testimony by the plaintiff that he would not have consented to hair transplant operations if he had been informed of the possibility of permanent scarring or of the possibility that he might look worse after the operations than before since plaintiff answered the question asked before any objection was made and sustained and no motion to strike plaintiff's answer was ever made.

APPEAL by plaintiff from *Giles Clark, Judge.* Judgment entered 5 February 1982 in Superior Court, DURHAM County. Heard in the Court of Appeals 16 May 1983.

*McCain, Essen & Orcutt, by Jeff Erick Essen and Grover C. McCain, Jr., for plaintiff appellant.*

*Newsom, Graham, Hedrick, Murray, Bryson, Kennon & Faison, by E. C. Bryson, Jr., and Charles F. Carpenter, for defendant appellee.*

BECTON, Judge.

I

In this medical negligence action, plaintiff, David Wayne Dixon, sued Dr. Calvin R. Peters, who performed a hair transplant procedure on the plaintiff, and Duke University, where the procedure was performed. At the close of plaintiff's evidence, Duke University was granted a directed verdict. At the close of all the evidence, plaintiff, having tried the case on an informed consent theory, consented to the entering of a directed verdict in Dr. Peters' favor on the issue of operative negligence. The question involving "informed consent" was submitted to the jury, and the jury returned a verdict in favor of Dr. Calvin Peters. Plaintiff appealed, and we are required to determine (a) whether N.C. Gen. Stat. § 90-21.13(a)(3) (1981), dealing with "Informed consent to health care treatment or procedure," is constitutional; and (b) whether the trial court's exclusion of evidence relating to plaintiff's consent was prejudicially erroneous. We hold that the challenged statute is constitutional and that the trial court did not err in its evidentiary rulings.

II

*Facts*

By the time he was thirty-three years old, plaintiff David Dixon had male pattern baldness and was bald approximately halfway back from the top of his head. Because he was self-conscious about this condition, Dixon contacted Dr. Peters, a plastic surgeon practicing in Durham, who performed hair transplant procedures. Dixon originally requested information on hair "plugging," a procedure whereby plugs of healthy hair are

surgically removed from one area of the head and transferred to another area of the head. However, Dr. Peters, after a consultation with Dixon, recommended a surgical procedure whereby strips of scalp bearing hair would be surgically removed from the backside of Dixon's head and sutured into place on the front of his head to create a hairline. A later operation would be necessary to fill in, behind this newly created hairline, plugs of healthy hair.

An operation to transplant the strips was performed on 12 November 1976, but by 16 March 1977 no hair was growing on either of the two strips, although the transferred scalp was alive and well. Because the strips had failed under optimal circumstances, Dr. Peters recommended a Juri-flap procedure which involved rotating a flap of hair-bearing scalp on the head with one end still attached to the head. The rotated flaps in the Juri-flap procedure carry their own blood supply with them when rotated; the strips of hair-bearing scalp do not depend upon the surrounding scalp for blood supply as was the case with the unsuccessful procedure.

During the three weeks following 16 March 1977, Dr. Peters performed three operations on Dixon to effect these Juri-flap transplants. As a result of these Juri-flap procedures, Dixon had scars or bald spots on the side of his head (the donor sites for the Juri-flaps) and scars across his forehead. In an attempt to "revise" these scars, Dr. Peters performed operations on 28 September 1977, 11 January 1978, and 29 March 1978. Having determined that Dixon was forming a good hairline as a result of the Juri-flap operations, Dr. Peters also performed hair-plugging procedures (placing plugs of healthy hair) in the bald space behind the Juri-flaps.

In May of 1978, Dr. Peters left North Carolina to practice medicine in Ohio. Dr. Peters gave Dixon the opportunity to continue as his patient in Ohio and, alternatively, offered to refer or transfer Dixon to local Durham physicians since Dixon needed additional plugs and additional scar revision to complete the procedure. Dixon underwent no further scar revision. He subsequently sued Dr. Peters and Duke University for the alleged negligence of Dr. Peters in performing the procedures, and for Dr. Peters' alleged negligent failure to inform him of the risk, principally the possibility of visible scarring at the completion of the procedure.

Dixon v. Peters

### III

*The Constitutionality of N.C. Gen. Stat. § 90-21.13(a)(3)*

G.S. § 90-21.13(a) reads as follows:

§ 90-21.13.  Informed consent to health care treatment or procedure.

(a) No recovery shall be allowed against any health care provider upon the grounds that the health care treatment was rendered without the informed consent of the patient or the patient's spouse, parent, guardian, nearest relative or other person authorized to give consent for the patient where:

(1) The action of the health care provider in obtaining the consent of the patient or other person authorized to give consent for the patient was in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities; and

(2) A reasonable person, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatments which are recognized and followed by other health care providers engaged in the same field of practice in the same or similar communities; or

(3) A reasonable person, under all the surrounding circumstances, would have undergone such treatment or procedure had he been advised by the health care provider in accordance with the provisions of subdivisions (1) and (2) of this subsection.

Dixon makes three separate constitutional attacks on G.S. § 90-21.13(a)(3). He argues that the statute is unconstitutional (a) as a legislative infringement on the judicial power delegated to the courts by Article IV, Section 1 of the North Carolina Constitution; (b) as applied to him because it violates the requirement of

Article I, Section 18 of the North Carolina Constitution that
"courts shall be open" and the substantive due process re-
quirements of the North Carolina and United States Constitu-
tions; and (c) because the statute violates the equal protection
provisions of the North Carolina and United States Constitutions.

## A.

[1] A patient, in a medical malpractice informed consent case,
must first prove that the doctor breached a duty properly to in-
form the patient of the risks and benefits of a proposed procedure
and must then prove that the negligence of the doctor was a prox-
imate cause of the injury to the patient. Dixon concedes that
"[d]efining [the] duty is a proper legislative function," but con-
tends that "rules of causation . . . are within the realm of 'judi-
cial' power" delegated to the general court of justice by the
North Carolina Constitution. We reject Dixon's argument that
G.S. § 90-21.13(a)(3) is a legislative attempt to redefine proximate
cause in medical negligence cases.

We are aware of our Supreme Court's decision in *McPherson
v. Ellis*, 305 N.C. 266, 287 S.E. 2d 892 (1982), defining proximate
cause in informed consent cases as "whether, if informed, this
particular patient would have foregone treatment." *Id.* at 272, 287
S.E. 2d at 896. In *McPherson*, however, the cause of action arose
in March 1975 prior to 1 July 1976, the effective date of G.S.
§ 90-21.13, which establishes a "reasonable person" standard.
Moreover, Article IV, Section 1 of the North Carolina Constitu-
tion which delegates judicial power to the courts of this State,
must be read in conjunction with Article IV, Section 13, which
grants to the legislature the power to promulgate rules of pro-
cedure to be used in the district and superior courts of this
State.[1] Under Section 13, our legislature has promulgated Rules

---

1. (2) *Rules of procedure.* The Supreme Court shall have exclusive authority to
make rules of procedure and practice for the Appellate Division. The General
Assembly may make rules of procedure and practice for the Superior Court and
District Court Divisions, and the General Assembly may delegate this authority to
the Supreme Court. No rule of procedure or practice shall abridge substantive
rights or abrogate or limit the right of trial by jury. If the General Assembly
should delegate to the Supreme Court the rule-making power, the General
Assembly may, nevertheless, alter, amend, or repeal any rule of procedure or prac-
tice adopted by the Supreme Court for the Superior Court or District Court Divi-
sions.

Dixon v. Peters

of Civil Procedure; our legislature historically has defined, shaped, and mandated certain rules of evidence. *See,* for example, N. C. Gen. Stat. §§ 8-1 (1981) *et seq.* Indeed, just recently, our legislature codified the Rules of Evidence.[2] Similarly, our Constitution gives the legislature power to create new causes of action and to grant or deny immunity. Proof of causation is an evidentiary matter, and the legislature's decision to legislate in this area is not an infringement of the judicial powers of the State courts.

## B.

We summarily reject Dixon's argument that G.S. § 90-21.13 (a)(3) violates Article I, Section 18 of the North Carolina Constitution which states that "[a]ll courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial or delay."

[2] We also reject Dixon's argument that using an objective (reasonable person) standard, rather than a subjective (personal) standard for determining proximate cause in informed consent cases violates his substantive due process rights under both the North Carolina and the United States Constitutions, but an analysis is necessary.

Whether a subjective or objective standard should be used in cosmetic surgery informed consent cases is a subject of considerable debate. In the absence of a statute like G.S. § 90-21.13, our Supreme Court in *McPherson* noted the problems with both standards.

> The problem with a subjective standard is that the only evidence usually available is the plaintiff's bald assertion, tempered by hindsight, as to what he would have done had he known all the facts. The apparent inequity of a jury basing its decision solely on such testimony has troubled courts, once even to the extreme of excluding the plaintiff's testimony on this issue. *Watson v. Clutts,* 262 N.C. 153, 160-61, 136 S.E. 2d 617, 622 (1964).

2. 1983 N.C. Sess. Laws 701.

The detriments of the objective standard are more severe, however. . . . In determining liability by whether a reasonable person would have submitted to treatment had he known of the risk that the defendant failed to relate, no consideration is given to the peculiar quirks and idiosyncracies of the individual. *His supposedly inviolable right to decide for himself what is to be done with his body is made subject to a standard set by others. The right to base one's consent on proper information is effectively vitiated for those with fears, apprehensions, religious beliefs, or superstitions outside the mainstream of society.*

Other state courts have wrestled with the problem whether to adopt an objective or subjective standard for determining proximate cause. *See, Sard v. Hardy,* 281 Md. 432, 379 A. 2d 1014 (1977); *Canterbury v. Spence,* 464 F. 2d 772 (D. C. Cir. 1972), *cert. denied,* 409 U.S. 1064, 34 L.Ed. 2d 518, 93 S.Ct. 560 (1972); *Wilkinson v. Vesey,* 110 R. I. 606, 295 A. 2d 676 (1972); *Woods v. Brumlop,* 71 N. M. 221, 377 P. 2d 520 (1962); *Poulin v. Zartman,* 542 P. 2d 251 (1975).

Although we, as did the *McPherson* Court, find the objective standard particularly harsh and find plaintiff's argument—that a person elects to change his appearance through cosmetic surgery by balancing his own insecurities about that appearance against the known risk and cost of the surgery—particularly compelling, plaintiff's challenge on substantive due process grounds must fall.

In determining whether a law violates substantive due process, the United States Supreme Court long ago formulated a two-tiered test: if the right infringed upon is a "fundamental" right, then the law will be viewed with strict scrutiny and the party seeking to apply the law must demonstrate a compelling state interest for the law to survive a constitutional attack; if the right infringed upon is not a fundamental right, then the party applying the law need only demonstrate that the statute is rationally related to a legitimate state interest. *Williamson v. Lee Optical,* 348 U.S. 483, 99 L.Ed. 2d 563, 75 S.Ct. 461 (1955).

We reject plaintiff's due process argument because (a) the statute is a rationally related means of accomplishing a desired result; (b) the due process violation claim by plaintiff is a *de minimis* one; and (c) *McPherson* is not controlling—indeed,

Dixon v. Peters

although effectively condemning the objective standard, the *McPherson* Court stated that "G.S. 90-21.13(a)(3) requires that the objective standard be applied to claims arising on or after 1 July 1976," 305 N.C. at 273, n. 2, 287 S.E. 2d 897, n. 2, and that "several of the principles set forth in this opinion are superseded by this statute. . . ." 305 N.C. at 269, n. 1, 287 S.E. 2d at 894, n. 1.

We discuss the State's legitimate interest in enacting G.S. § 90-21.13(a)(3) at length because the parties have so prominently set forth the medical malpractice crisis of the 1970's as a basis of the legislation. Although there is considerable support for the proposition that the medical malpractice crisis was more feigned than real,[3] and although the State has no interest, legitimate or

---

3. The following excerpts are taken from pages 12-16 of plaintiff's brief:

"Meaning no disrespect, the regular voting membership of the [North Carolina Professional Liability Insurance] Study Commission during its extended deliberations consisted of 2 doctors, 2 insurance company representatives, a hospital administrator, and a pharmacist." Report of the North Carolina Professional Liability Insurance Study Commission, Minority Report (1976).

As the Study Commission Report noted, as soon as the N. C. Medical Society helped form a competing malpractice insurer—Medical Mutual Insurance Co.—St. Paul dropped its threats of leaving North Carolina. Even during the hysteria of 1976, sane and informed voices were heard.

"It is no accident that the St. Paul Insurance Company in defending medical malpractice claims over approximately twenty years has never lost a jury trial in the entire State of North Carolina. There is no medical malpractice problem in North Carolina, only an insurance pricing problem resulting from losses in California, New York and other States where the claims climate is so much more severe than in North Carolina, and from investment losses incurred by the insurance company not unlike losses that have been suffered by other corporate investors during this period of national economic instability and uncertainty." *Id.* at 4-5.

. . . .

"From 1975 through 1978, during the early part of which the nation was suffering a crisis in the availability of malpractice insurance because insurers felt they were not being paid adequately for the risk, the St. Paul took in $415 million in malpractice premiums and paid out $27 million in claims and claims-settlement expenses. Even so, in the fall of 1978, a St. Paul executive told the Conference of Insurance Legislators (an association of state legislators) that St. Paul *had lost money* in medical malpractice throughout 1975, but that the line had been 'generally profitable' during 1976 and 1977. All of this was based on estimates and assumptions, presumably made in good faith, that only time could cor-

otherwise, in favoring the profits of insurance companies over the rights of patients to be compensated for bodily injury caused in medical negligence cases, unless it be argued that any segment of the public in financial distress be at least partly relieved of financial accountability for its negligence, *Simon v. St. Elizabeth Medical Center*, 3 Ohio Op. 3d 164, 355 N.E. 2d 903 (1976), the State does have a legitimate interest in setting the standards by which a jury can determine whether malpractice has occurred. The State most assuredly has an interest in the availability of less costly health care to all its citizens.

The problem is sharply put into perspective by the parties in their respective briefs. The plaintiff argues:

> In the early 1970's a so-called 'malpractice insurance crisis' began to receive nationwide attention. Under heavy lobbying from St. Paul Insurance Company and the medical profession, our General Assembly passed a package of special legislation aimed at reducing the number of claims by injured patients and thereby protecting the profits of the insurers. [Citation

roborate. (At the time of the speech, $52.7 million in premiums had been collected for 1975 but only about 6 million actually paid out.)" A. Tobias, *The Invisible Bankers: Everything the Insurance Industry Never Wanted You to Know* 31 (1982).

"By the end of 1980, it had begun to appear that 1975 had not been such a loser, after all. Of the $52.7 million the St. Paul had collected in premiums, $15.5 million had been paid out in losses and legal fees; only an estimated $9.2 million remained to be paid. Losses and loss expenses actually paid for the years 1975 through 1978—against total premiums of $415 million—had climbed to $78 million. Even after a hefty $87 million in selling and administrative expense, that still left a quarter of a billion dollars." *Id.* at 32.

. . . .

One fascinating study of malpractice insurance notes that:

"There is some evidence indicating that in recent years the malpractice insurance industry has overstated the reserves set aside for reported claims. For example, in 1974, when St. Paul requested an 82 percent rate increase for North Carolina, a task force from the state insurance department made an on-site review of the company's claims files at its home and local offices. Its examination concluded that claims reserves for claims actually paid were overstated by 33 percent, and that 19 percent of all reserves were held for claims which were settled without payment." S. Law and S. Polan, *Pain and Profit: The Politics of Malpractice* 181-82 (1978).

omitted.] This package included G.S. § 90-21.13(a)(3) which is the subject of this appeal.

The package of legislation was passed primarily on the strength of the report of the North Carolina Professional Liability Insurance Study Commission (1976) and that report clearly reveals that the sole purpose of the legislation was to avoid valid claims. Plaintiffs contend that this is not a legitimate state interest.

Responding to the assertions in plaintiff's brief, appellees state in their brief:

Although the Appellant denies it, North Carolina and the other 49 states are experiencing a 'medical malpractice crisis' of some proportion. The Appellant cannot deny that recently there has been a dramatic rise in the number of malpractice suits filed, a corresponding increase in the premium costs for malpractice insurance for doctors, and greater recoveries for successful plaintiffs. One can debate the hows and whys of these sudden increases, but the ultimate fact is that the consumer must bear greater medical bills in order to finance the high cost of malpractice litigation. The 1976 legislation was an attempt to set standards by which it could be determined whether malpractice had occurred or not while at the same time reducing the circumstances under which successful recovery for malpractice could be obtained. G.S. § 90-21.13 represents a part of that 1976 legislation.

Although the problem, real or imagined, may have been handled differently, and while a subjective standard seems the lesser of evils, it is sufficient for due process purposes that the legislative response to the perceived problem was a rational way to correct the problem. For, as the Supreme Court said in *Williamson*, "the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." 348 U.S. at 487-88, 99 L.Ed. 2d at 572, 75 S.Ct. at 464. For constitutional analysis, then, G.S. § 90-21.13(a)(3) serves a legitimate state function, and it does not matter that another alternative could have been chosen.

## C.

[3]  In his final constitutional argument, Dixon contends that the statutory standard of proximate cause discriminates against the victim of informed consent cosmetic surgery tort cases and is not substantially related to the achievement of any important state interest.

The United States Supreme Court has recently developed a three-tiered analysis for reviewing the constitutionality of statutes in an equal protection challenge context. The first and third tiers of the analysis are the same as those used for reviewing statutes challenged under a substantive due process claim — suspect class/fundamental right: strict scrutiny; rational basis/legitimate state interest: low scrutiny. The second, or middle tier, test applies when the class is close to, but not quite suspect or the interests are very important, but not quite fundamental. *See, Reed v. Reed,* 404 U.S. 71, 30 L.Ed. 2d 225, 92 S.Ct. 251 (1971) (women) and *Stanley v. Illinois,* 405 U.S. 645, 31 L.Ed. 2d 551, 92 S.Ct. 1208 (1972) (interest of a father in raising his illegitimate children outweighed the lesser objective of administrative convenience). Under this middle tier scrutiny test, the classification must serve important governmental objectives and must be "substantially related to the achievement of those objectives" to survive an equal protection challenge. *Craig v. Boren,* 429 U.S. 190, 197, 50 L.Ed. 2d 397, 407, 97 S.Ct. 451, 457 (1976), *reh'g denied,* 429 U.S. 1124, 51 L.Ed. 2d 574, 97 S.Ct. 1161 (1977).

Dixon concedes, as he must, that he does not belong to a suspect class. Further, we find no basis to support Dixon's assertion that the statute in question should be analyzed using the middle tier (substantial state interest) test, rather than the lower tier (rational basis/legitimate state interest) test. We also reject Dixon's assertion that there is a semi-fundamental right to be compensated for the injury he received. There are constitutional provisions involving  sovereign immunity, and statutory prohibitions including rules of procedure and statutes of limitation that restrict the ability of plaintiffs to recover for certain injuries. The statute in this case does not deny recovery to victims of medical negligence. As discussed in Part III-B, *supra,* there is a rational basis for the promulgation of G.S. § 90-21.13, and it survived Dixon's equal protection claim.

## IV

*Evidentiary Matters*

**[4]**  In his first assignment of error relating to evidentiary matters, plaintiff contends that the trial court committed reversible error by excluding testimony by the plaintiff that he would not have consented to the hair transplant operations if he had been informed of the possibility of permanent scarring or of the possibility that he might look worse after the operations than before. The parties rely on *McPherson v. Ellis; Watson v. Clutts*, 262 N.C. 153, 136 S.E. 2d 617 (1964); *Simons v. Georgiade*, 55 N.C. App. 483, 286 S.E. 2d 596, *disc. rev. denied*, 305 N.C. 587, 292 S.E. 2d 571 (1982); and G.S. § 90-21.13(a)(3) for their respective positions; however, no analysis based on these cases and the statute is necessary. We find no error on this issue since the record indicates that the jury twice heard plaintiff say that had he known about the outcome of the operations, he would not have consented. As the following colloquy shows, plaintiff answered the question asked before any objection was made and sustained, and no motion to strike plaintiff's answer was ever made:

> Q. I didn't ask you what you knew. Mr. Dixon, at any time before Dr. Peters performed any one of these three procedure [sic] on you, if you had been warned that you might have had permanent scarring, or if you had been warned that the results from these procedures might be worse than when you originally went to him, would you have consented to any one of these procedures?

> A. No, no way.

> OBJECTION.

> (Bench conference.)

> COURT: Sustained.

Further, while plaintiff was being cross-examined about the consent form he signed for one of the operations, the following occurred:

> Q. Now, Mr. Dixon, does that document not state that "the nature and purpose of the operation, alternative methods of treatment, and the risks involved have been explained to me."

A. Yes, sir.

Q. "No guarantee has been given as to the results that may be obtained."

A. Yes, sir, but I wouldn't have never signed it if I had known this was the way it was coming out.

No objection or motion to strike was made to this testimony. Plaintiff clearly was not prejudiced as he contends in this assignment of error.

In his final assignment of error, plaintiff contends that the trial court committed reversible error by excluding testimony by Stuart Bennett that Dr. Peters told Bennett that when he was finished, plaintiff would have a "head full of hair." We summarily reject this argument. Similar testimony was admitted by plaintiff and another one of his witnesses. More fundamentally, however, this case was tried on the theory that Dr. Peters negligently failed to inform plaintiff of the full extent of the risks of the transplant procedures; this case was not tried on a guarantee theory. Consequently, Bennett's testimony was irrelevant to the issue in controversy.

V

We summarily reject Dr. Peters' cross-assignment of error that the trial court erred in not directing a verdict pursuant to Rule 50 of the North Carolina Rules of Civil Procedure in his favor. The issues were properly submitted to the jury.

VI

For the reasons stated above, the judgment entered in this action is

Affirmed.

Chief Judge VAUGHN and Judge HILL concur.