LEWIS W. DONAVANT v. ALLEN S. HUDSPETH, M.D.

No. 429PA85

(Filed 29 August 1986)

1. **Evidence § 29.3— hospital records—no admissibility under business records exception to hearsay rule**

    In a medical malpractice action the Court of Appeals erred in holding that hospital records were admissible as substantive evidence under the business records exception to the hearsay rule where the part of the records objected to, that "[Defendant] apparently was concerned about the possibility" that veins implanted during heart bypass surgery on plaintiff had been put in incorrectly, was not based on firsthand knowledge of the preparer and the contested record itself did not clearly indicate that defendant had expressed such a concern to the author of the report. Furthermore, the author of subsequent reports which repeated the objectionable information stated that his source was the first report, which was shown to have been prepared based upon information from unidentified sources other than the only possible non-hearsay source, defendant, and the subsequent reports were therefore inadmissible.

2. **Evidence § 34.6— statement by physicians to another physician—no exception to hearsay rule**

    A statement made by one physician to another regarding the non-testifying physician's observations of the patient and statements by yet a third physician regarding his concerns about the patient's condition did not come within the hearsay exception of statements made by a patient to a treating physician.

3. **Partnership § 1— doctors working together not partners—statement by one not admission of other**

    Though another doctor and defendant worked for the same hospital and worked together as a team, and both treated plaintiff, they were not partners, and statements made by the other doctor were thus not admissible as a vicarious admission of defendant.

1

**4. Evidence § 50— information obtained from fellow physician—insufficient basis for expert opinion**

Though medical information obtained from a fellow physician who has treated the same patient is sufficiently reliable to be used by a testifying physician as a partial basis for his expert opinion, such information is not independently admissible into evidence.

**5. Evidence § 33— hearsay evidence not falling within recognized exception—admissibility**

The requirement that hearsay evidence not falling within a recognized exception to the hearsay rule and offered because of necessity and a reasonable possibility of truthfulness may be resorted to only when more probative evidence on the point cannot be procured through reasonable efforts is a salutary rule and applies to hearsay evidence offered in a trial conducted prior to the effective date of the N. C. Rules of Evidence.

**6. Physicians, Surgeons and Allied Professions § 15.1— expert opinion—basis —information from another doctor**

Facts and data known to and provided by other health care professionals to physicians may be considered reliable and may be used by the physician in forming his expert opinion, but the opinion must be one formed by the physician relying on his personal knowledge and expertise; therefore, the trial court in a medical malpractice action properly excluded any statement by plaintiff's expert medical witness regarding an opinion based solely on the statement of another doctor because at that time the witness had not in fact formed an independent opinion but had merely adopted an opinion allegedly formed by another cardiologist.

**7. Physicians, Surgeons and Allied Professions § 15.1— expert opinion—statement by one doctor to another as basis—unreliability of information**

Although generally statements by one treating physician to another are inherently reliable and may be used as the basis for an expert opinion and are admissible in evidence to show the basis for the expert opinion, when the trial judge determines on *voir dire* that the source of the physician's statement is in fact unreliable, he may exclude the statement as evidence for any purpose.

Justice MARTIN concurring.

DEFENDANT'S petition for discretionary review pursuant to N.C.G.S. § 7A-31 of a decision of the Court of Appeals, 75 N.C. App. 321, 330 S.E. 2d 517 (1985) was allowed 19 September 1985.

In this medical malpractice action, the plaintiff alleges, *inter alia,* that the defendant surgeon negligently sutured vein grafts in backwards (unreversed) during coronary artery bypass surgery, causing four of the five grafts to become occluded (blocked) shortly after the surgery, resulting in pain and disability and necessitating repeat bypass surgery. From a judgment entered by

Judge Long in Forsyth County Superior Court on 28 July 1983 upon a jury verdict in favor of the defendant, the plaintiff appealed to the Court of Appeals. The Court of Appeals reversed and ordered a new trial. Heard in the Supreme Court on 12 February 1986.

*Young, Haskins, Mann, Gregory & Young, by Robert W. Mann, and Cofer and Mitchell, P.A., by Eddie C. Mitchell, for plaintiff-appellee.*

*Petree, Stockton, Robinson, Vaughn, Glaze & Maready, by J. Robert Elster, Michael L. Robinson and J. Stephen Shi, for defendant-appellant.*

BILLINGS, Justice.

In March of 1979, the plaintiff, then aged 43, consulted Dr. Joseph Gaddy, a cardiologist in Winston-Salem, because of chest pain (angina). Dr. Gaddy referred the plaintiff to Dr. Fred Kahl, a cardiologist at North Carolina Baptist Hospital in Winston-Salem, for tests to determine whether coronary bypass surgery was indicated. Dr. Kahl concurred with Dr. Gaddy that the bypass operation was appropriate.

Dr. Kahl recommended the defendant, a surgeon at North Carolina Baptist Hospital, to perform the surgery. The seven-and-one-half-hour bypass procedure was performed on 29 March 1979. Dr. Kahl did not attend or participate in the surgical procedure. Shortly after the surgery was completed, Dr. Kahl was called to the hospital where he performed a cardiac catheterization on the plaintiff. A cardiac catheterization is a procedure within the peculiar expertise of cardiologists and results in angiogram films, a type of X-ray moving picture of the bypass grafts. These films were reviewed by Dr. Kahl and the defendant and on 2 October 1979 were acquired by Dr. Gaddy who mailed them to Dr. Usher, a cardiologist in South Carolina. The films apparently were lost when Dr. Usher mailed them back to Dr. Gaddy addressed to Baptist Hospital and as a result were not available for trial. The parties stipulated that the films were lost and that neither party contends that the other intentionally lost or destroyed them. By 6 June 1979 when another cardiac catheterization was performed, three of the five grafts had become occluded. According to the plaintiff's evidence, in 1982 four of the five grafts were occluded

and the plaintiff was again operated on by a surgeon in Milwaukee, Wisconsin. Also according to the plaintiff's evidence, at the time of trial he was permanently and totally disabled to work although the second bypass procedure was successful and his health was slowly improving.

Plaintiff offered testimony by Dr. Gaddy that Dr. Gaddy had reviewed the angiogram films taken on the evening after the first bypass procedure and that in his opinion the films showed that the veins had been put in "backwards" or "unreversed"; that is, in such a way that the valves in the veins, if competent, would obstruct the blood flow to the heart.

Dr. Dudley Johnson, a cardiac surgeon who in 1982 performed the second bypass procedure on the plaintiff, testified that in his opinion the vein grafts had been sewn in in an unreversed fashion during the 29 March 1979 bypass and that the failure properly to reverse the grafts contributed to the grafts' closing.

The defendant denied that the veins were sewn in backwards or that he was ever concerned that they might have been sewn in backwards. The defendant also offered evidence to the effect that to sew in backwards a vein with incompetent or nonoperating valves would not make any difference since such valves would not obstruct blood flow.

The parties agreed to a nine-member majority verdict. The jury, by a nine-to-two vote (the record does not indicate why there were only eleven members on the jury) rendered a verdict in favor of the defendant on the liability issue.

The plaintiff assigns as error the rulings of the trial judge that certain evidence offered by the plaintiff was inadmissible. The proffered evidence consisted of the following:

1. Testimony by Dr. Gaddy regarding the substance of a telephone conversation between Dr. Gaddy and Dr. Kahl concerning the plaintiff two or three days after the 29 March 1979 bypass surgery. Dr. Gaddy would have said that Dr. Kahl told him that the post-surgery cardiac catheterization was done because of concern that the veins had been placed in backwards; that although the catheterization showed that the veins were indeed in backwards, because the veins were incompetent and the blood flow was ade-

quate, Dr. Kahl and Dr. Hudspeth decided not to risk reoperation.

2. One sentence from each of six reports or letters contained in the hospital records relating to the plaintiff as follows:

A. In a report of the results of the 29 March 1979 cardiac catheterization, prepared by "Lynn Orr, M.D. for Frederic R. Kahl, M.D.," and signed by Dr. Kahl, a sentence stating that "The patient did well both intra and postoperatively, but Dr. Hudspeth apparently was concerned about the possibility that the saphenous vein grafts had been sutured in unreversed, and for this reason this emergency procedure was performed."

B. In a letter dated 2 April 1979 from Dr. Kahl to Dr. Gaddy, a statement that "Because of concern that the saphenous vein grafts were not reversed when they were inserted, Dr. Hudspeth asked me to perform a repeat arteriogram immediately after surgery."

C. In an 11 June 1979 letter from Dr. Kahl to Dr. Gaddy reporting the results of a 4 June 1979 admission and 6 June 1979 cardiac catheterization, a statement in the history portion of the letter that:

"Because of the question about whether the vein grafts had been reversed at the time of surgery, he underwent selective graft angiography several hours following his surgery and all grafts were patent and each of the 5 vessels bypassed were seen."

D. A part of a history of present illness in an admission history and report of physical examination on 4 June 1979 signed by Dr. Kahl stating: "The patient was evaluated with a second catheterization for coronary angiography on the same day several hours after surgery as there was some question as to whether the veins had been placed with the grafts in reverse position (i.e. with valves obstructing the flow)."

E. In a report of the 6 June 1979 cardiac catheterization results, a statement, referring to the earlier bypass, that: "The patient did well both intra and postopera-

tively but Dr. Hudspeth apparently was concerned about the possibility that the saphenous vein grafts had been sutured in unreversed and for this reason emergency arteriograms of the bypass grafts were performed on the night of surgery."

F. A portion of a discharge summary following the 4 June 1979 admission, prepared by Dr. Kahl, stating that: "The patient had a five-vessel repair and several hours after his surgery there was some question of whether the veins had been reversed and coronary angiography revealed that there was good flow through all the grafts."

## I.

[1] We first consider the holding by the Court of Appeals that the hospital records were admissible as substantive evidence under the business records exception to the hearsay rule. Because this case was tried during the 18 July 1983 session of Forsyth County Superior Court, in considering this question we apply the law of evidence as it existed prior to the 1 July 1984 effective date of the North Carolina Rules of Evidence, N.C.G.S. Chapter 8C.

This Court has long recognized a rule which allows the admission, over an objection based upon the prohibition of hearsay evidence, of hospital records as entries made in the regular course of business. 1 *Brandis on North Carolina Evidence* § 155 (1982). *Sims v. Insurance Co.*, 257 N.C. 32, 125 S.E. 2d 326 (1962). In *Sims*, this Court stated that the requirements for admission of hospital records are:

The hospital librarian or custodian of the record or other qualified witness must testify to the identity and authenticity of the record and the mode of its preparation, and show that the entries were made at or near to the time of the act, condition or event recorded, that they were made by persons having knowledge of the data set forth, and that they were made *ante litem motam*. The court should exclude from jury consideration matters in the record which are immaterial and irrelevant to the inquiry, and entries which amount to hearsay on hearsay.

*Id.* at 35, 125 S.E. 2d at 329.

The simple fact that a record qualifies as a business record does not necessarily make everything contained in the record sufficiently reliable to justify its use as evidence at trial. *See Watson v. Clutts*, 262 N.C. 153, 136 S.E. 2d 617 (1964) (another point in this case was disapproved by *McPherson v. Ellis*, 305 N.C. 266, 287 S.E. 2d 892 (1982)).

The defendant filed a motion *in limine* to prohibit the plaintiffs from tendering the portions of medical records signed jointly or singly by Drs. Orr and Kahl "reciting as 'history' that a cardiac catherization [sic] test was requested on the evening of March 29, 1979, because 'Dr. Hudspeth apparently was concerned about the possibility that the saphenous vein grafts had been sutured in unreversed,' or words to that effect." The grounds for the motion were that Dr. Hudspeth had denied under oath ever saying or even thinking that the veins might have been sewn in unreversed; Dr. Orr testified in deposition that he did not obtain the information from Dr. Hudspeth, Dr. Hudspeth had never made any such statement to him, and Dr. Orr had no personal knowledge of the information contained in the report; and that Dr. Kahl testified under oath that he had no discussions with Dr. Orr about the history portion of the 29 March catheterization report and had no recollection of Dr. Hudspeth stating to him that the catheterization was needed because of concern that the veins might have been put in unreversed. There is no indication in the record of a ruling on the motion *in limine*.

When the matter came on for trial before Judge Long and a jury, the plaintiff tendered Plaintiff's Exhibit 2 which consisted of the unexpurgated medical reports which are the subject of the defendant's objection. Plaintiff's Exhibit 2 was stipulated to be authentic. The trial judge conducted a *voir dire* hearing and sustained the defendant's objection. Thereafter, the medical records, excluding the portions to which the trial court had sustained defense objections, were received into evidence without objection as Plaintiff's Exhibit 3. In addition to the reports prepared by Dr. Orr and Dr. Kahl, the medical records included a discharge summary signed by the defendant from which no deletions were made.

As stated in 1 *Brandis on North Carolina Evidence* § 8, "Except [when the *relevancy* of the proffered evidence depends upon

the existence of some other fact which also requires proof], it is the sole province of the judge to determine preliminary questions of fact upon which admissibility depends." *See also State v. Whitener*, 191 N.C. 659, 132 S.E. 603 (1926); N.C.G.S. § 8C-1, Rule 104(a).

The defendant's position throughout this litigation has been that one of the requirements for admission of the contested portions of the medical records as part of a business record, i.e., that they were made by persons having knowledge of the data set forth and were not hearsay on hearsay, has not been met.

The first of the records which contains reference to a reason for the post-operative catheterization was the report of the results of the catheterization prepared by Dr. Orr. The report stated that "Dr. Hudspeth *apparently* was concerned about the possibility that the saphenous vein grafts had been sutured in unreversed." (Emphasis added.) This phraseology does not clearly indicate that Dr. Hudspeth had expressed such a concern to the author of the report; in fact, if it suggests anything, it is that a concern was *not* expressed by Dr. Hudspeth directly to the author.

According to testimony of Dr. Orr given in a pretrial deposition and received during *voir dire*, on 29 March 1979 he was a second-year fellow in the Section of Cardiology at North Carolina Baptist Hospital. He was on call on that day, which meant that he would help to perform any study that occurred after usual hours, and was not working for anyone in particular. He assisted Dr. Kahl in performing the cardiac catheterization on the plaintiff and prepared the report. He stated that, although he asked the people present in the catheterization lab when he got there what was going on and why they were doing the catheterization, he did not talk to Dr. Hudspeth. He stated that in writing the report he used the word "apparently" because he had not talked to Dr. Hudspeth directly and had not heard Dr. Hudspeth say why the study was being done. He does not recall who told him that there was concern about the position of the vein grafts.

The report states that it was prepared by Lynn Orr, M.D., for Frederic R. Kahl, M.D. and is signed "F. R. Kahl." Dr. Kahl was called by the plaintiff as a witness and testified that he had no independent recollection of talking to Dr. Hudspeth about the

cardiac catheterization. The plaintiff offered no other evidence regarding the method of preparation of the medical records or the source of the statement about Dr. Hudspeth's apparent reason for requesting the catheterization.

Although we agree with the plaintiff that "evidence of practice and a reasonable assumption that general practice was followed in regard to a particular matter," Cleary, *McCormick on Evidence* § 310 (1972), is sufficient to establish *prima facie* that the business record was prepared from personal knowledge, in the case *sub judice* the defendant presented positive evidence that the report in question was prepared by Dr. Orr and that he did not talk with Dr. Hudspeth and had no firsthand knowledge about the reasons for Dr. Hudspeth's requesting the catheterization. The trial judge conducted a *voir dire* hearing on admissibility and after hearing evidence regarding the source of the information contained in the hospital record, ruled that the contested portion of the report was inadmissible. The record does not reflect a request by either party that the trial judge make findings of fact; therefore, he was not required to set out his findings on the preliminary questions necessary to determination of the admissibility of the evidence. N.C.G.S. § 1A-1, Rule 52. In the absence of findings, we presume that the trial judge found the facts consistent with all of the evidence and which support his ruling. *See Fungaroli v. Fungaroli*, 51 N.C. App. 363, 276 S.E. 2d 521, *cert. denied*, 303 N.C. 314, 281 S.E. 2d 651 (1981); *see also State v. Bullard*, 312 N.C. 129, 322 S.E. 2d 370 (1984).

The trial judge's ruling that the excluded portion of the catheterization report was not rendered admissible by the business record exception to the hearsay rule was proper.

We note that the Court of Appeals stated that "While the reports may have been prepared by an intern or resident, the reports were signed by Dr. Kahl. In the absence of fraud, one who signs a writing is presumed to do so with full knowledge and assent as to its contents." 75 N.C. App. at 324, 330 S.E. 2d at 52. The cases cited by the Court of Appeals as authority have no application to the question presented here. *Williams v. Williams*, 220 N.C. 806, 18 S.E. 2d 364 (1942), holds that in the absence of fraud or a showing that the person who signed a paper writing was willfully misled or misinformed as to its contents, a person

cannot be relieved of the obligations contained in his agreement simply because he was mistaken as to the contents of the writing. In *State v. King*, 67 N.C. App. 524, 313 S.E. 2d 281 (1984) the court said that the rule in civil cases that a person signing a paper writing is presumed to have signed with full knowledge of its contents also applies in criminal cases. Neither of these cases suggests a rule that a person who signs a paper writing is presumed to have firsthand knowledge of facts or data contained in the paper writing; they have no applicability to the question of sufficiency of the evidence necessary for laying the foundation for introduction of business records into evidence against a person who did not sign the records.

Dr. Kahl's signature on the report prepared by Dr. Orr does not alter our conclusion that the trial judge properly excluded the contested portion of the report, for his signing the report in no way conflicts with the positive evidence that the source of the information placed by Dr. Orr in the report was not Dr. Hudspeth.

Regarding the remainder of the medical records and the portions of the histories contained therein which refer to the reason for performing the cardiac catheterization, Dr. Kahl stated that it was correct that the subsequent record, discharge summary and letter to Dr. Gaddy all picked up that same bit of information from that original statement in the March 29, 1979, report and "We repeated it, and evidently, we did not question it, yes."

Here, again, the defendant contends that the information placed in the subsequent medical reports as history was not placed there "by persons having knowledge of the data set forth," *Sims v. Insurance Co.*, 257 N.C. at 35, 125 S.E. 2d at 329, for the author of the letter and reports stated that his source was the first report, which was shown to have been prepared based upon information from unidentified sources other than the only possible non-hearsay source, Dr. Hudspeth.

The plaintiff nevertheless contends that Dr. Kahl was not relying solely on Dr. Orr's report, for aside from the report, Dr. Kahl must have learned from Dr. Hudspeth the reason for the request for the highly-unusual emergency cardiac catheterization almost immediately after bypass surgery.

In Dr. Kahl's letter of 2 April 1979 to Dr. Gaddy, Dr. Kahl states: "Because of concern that the saphenous vein grafts were

not reversed when they were inserted, *Dr. Hudspeth asked me to perform a repeat arteriogram immediately after surgery.*" (Emphasis added.) While this statement does not in fact state that Dr. Hudspeth personally told Dr. Kahl of the reason for the repeat arteriogram, it suggests that he did. If the letter is admissible as a business record because it was contained in the hospital records and Dr. Kahl, the author of the letter, had firsthand knowledge of a statement therein made by Dr. Hudspeth, Dr. Hudspeth's statement in the report would be admissible as a statement of a party opponent, a recognized exception to the hearsay rule. *See* N.C.G.S. § 8C-1, Rule 801(d).

Dr. Hudspeth was called by the plaintiff as an adverse witness. He denied ever being concerned about the possibility of the veins having been sewn in backwards and ever having made a statement suggesting a concern.

The defense called the coordinating supervisor for the operating room who was present during the plaintiff's surgery. She testified before the jury that she remembered no discussion by anyone in the operating room about vessels being possibly reversed.

The nurse anesthetist who attended the plaintiff both during the bypass surgery and during the subsequent cardiac catheterization stated that she left the plaintiff at 7:15 p.m. but was called back to the intensive care unit at about 8:30 p.m. and moved the plaintiff from intensive care to the cardiac catheterization lab. When she got to the cardiac catheterization lab for the catheterization on the plaintiff, Dr. Hudspeth was there. She "did not hear Dr. Hudspeth state a reason why the catheterization was being done." She further testified that: "I did not hear any statement in the catheterization lab either during the catheterization or afterwards about the veins being put in backwards," although she was present with the patient throughout the procedure, and "[d]uring the emergency catheterization, Dr. Hudspeth and Dr. Kahl were there together looking at the film. I heard one of them say 'Everything looks good. There's good flow.'" She also said: "I have never heard Dr. Hudspeth make any statement about why he had a catheterization done on Mr. Donavant on the night of March 29, 1979."

Dr. Kahl, called as a rebuttal witness by the plaintiff, testi-fied that his independent recollection of the events on the night of 29 March 1979 was not clear. He stated:

The only independent recollection that I have regarding the emergency angiogram that was performed on March 29th was that . . . I was beeped on my radio pager to call the hospital. I spoke with someone in the hospital, and I am not sure who, and obviously was asked to come in and do an emergency cardiac  catheterization. My next recollection of that evening is that we were doing or had done the cardiac catheterization on Mr. Donavant, and I was pleased that things went so well and that he had relatively little trouble with the arteriogram and that we were pleased with the results of the arteriogram. *I don't have any independent recollection of talking to Dr. Hudspeth or viewing the films with him.* [Emphasis added.]

Jacqueline Donavant, the plaintiff's wife, testified that follow-ing the bypass procedure Dr. Hudspeth came into the waiting room and asked for permission to perform a procedure to find out if the blood was flowing properly, stating to her that one of his concerns was that "In the process of putting these veins in your husband's heart, I am afraid they have been put in backwards." After stating that she gave Dr. Hudspeth permission to do the catheterization and that he said they were going to do it "right away, as soon as possible," she stated that she "looked up, and Dr. Kahl was there."

Dr. Gaddy testified on *voir dire* to a telephone conversation with Dr. Kahl sometime between 30 March and 2 April 1979 in which Dr. Kahl stated that the plaintiff "underwent an emergency catheterization after surgery because of concern that the valves, that the veins were not properly reversed, that they were in backwards so to say." Although in his testimony Dr. Gaddy did not say that Dr. Kahl ascribed any particular statement to Dr. Hudspeth, he gave the following answers to questions on *voir dire* regarding the decision not to re-perform surgery:

Q. Did Dr. Kahl tell you who was participating with him in the decision making process that you described at the time on the night of surgery?

A. Yes.

Q. Who did he tell you?

A. Dr. Hudspeth.

Thus it appears that there was a factual question which had to be resolved prior to determination of the admissibility of the contested portions of the business records; i.e., whether the entries of those portions ascribing to Dr. Hudspeth a concern about the orientation of the veins were the result of Dr. Kahl's first-hand knowledge of concern expressed by Dr. Hudspeth. The resolution of facts preliminary to admissibility of evidence is within the province of the trial judge. 1 *Brandis on North Carolina Evidence* § 8 and cases cited therein. *See* also N.C.G.S. § 8C-1, Rule 104(a). The trial judge ruled that the contested portions of the medical records were not admissible, but, again, he was not requested to make findings of fact and did not indicate how he resolved the preliminary factual question. "Findings of fact and conclusions of law are necessary on decisions of any motion . . . only when requested by a party." N.C.G.S. § 1A-1, Rule 52 (1983). If no findings of fact are required, the findings which support the trial judge's ruling are deemed implicit in the ruling. *State v. Bullard*, 312 N.C. 129, 322 S.E. 2d 370; *State v. Perry*, 275 N.C. 565, 169 S.E. 2d 839 (1969). Based upon the presumed finding that Dr. Kahl did not have firsthand knowledge regarding the information contained in the contested portions of the medical reports, we reverse the Court of Appeals' holding that exclusion of those portions of the medical records for substantive use was error.

II.

Turning now to the telephone conversation which Dr. Gaddy testified that he had with Dr. Kahl sometime between 30 March and 2 April 1979, we again note that it is unclear whether in the conversation as described by Dr. Gaddy, Dr. Kahl attributed any statement regarding the vein valve orientation to Dr. Hudspeth. Assuming that we read the description as indicating that Dr. Hudspeth made an admission that the veins were in backwards, the information was offered not by the testimony of Dr. Kahl but through Dr. Gaddy's testimony regarding what Dr. Kahl said. Dr. Kahl does not deny the conversation; he stated that he did not *remember* talking with Dr. Gaddy between 29 March and 2 April.

The question facing the Court is whether Dr. Kahl's hearsay statement is admissible substantively as an exception to the hearsay rule.

If the statements of Dr. Kahl to Dr. Gaddy are admissible as an exception to the hearsay rule, further hearsay attributable to Dr. Hudspeth would be admissible as a statement of a party opponent. Other portions of the statement recite what actions were taken and observations made by Dr. Kahl and do not involve hearsay on hearsay.

The plaintiff contends that Dr. Kahl's statement is substantively admissible for one or more of the following reasons:

A. It was made by one treating physician to another treating physician in the usual course of professional practice solely for medical and diagnosis [sic] purposes.

B. It was a vicarious admission of the defendant.

C. It was a declaration against Dr. Kahl's interest.

D. It is reliable because of sufficient attending circumstantial guarantees of trustworthiness.

[2] In this State the General Assembly now has provided as part of N.C.G.S. § 8C-1, Rule 803(4), that statements made by a patient to his physician[1] for purposes of medical diagnosis or treatment are inherently reliable and therefore admissible through the testimony of the physician. Whether the previous rule was as liberal as is present Rule 803(4) is questionable, *see* 1 *Brandis on North Carolina Evidence* § 161, but even if it was, in the case *sub judice*, the testimony offered through Dr. Gaddy was not a statement made by the patient regarding his condition but was a statement made by one physician to another regarding the non-testifying physician's observations of the patient and statements by yet a third physician regarding his concerns about the patient's condition. This testimony does not come within the hearsay exception of statements made by a patient to a treating physician. *See id.*

---

1. Rule 803(4) does not limit the permissible testifying recipient of the statement to a treating physician so long as the purpose of the declarant's statement is to obtain medical treatment for himself. *State v. Smith*, 315 N.C. 76, 337 S.E. 2d 833 (1985).

[3]   We also reject the plaintiff's assertion that because the two physicians, Dr. Kahl and Dr. Hudspeth, both treated the plaintiff, Dr. Kahl's statements are admissible as a vicarious admission of Dr. Hudspeth. The case of *Simmons v. Georgiade*, 55 N.C. App. 483, 286 S.E. 2d 596, *rev. denied*, 305 N.C. 587, 292 S.E. 2d 571 (1982), relied upon by the plaintiffs, is not applicable to the facts of this case. In *Simmons*, the Court of Appeals quoted and applied the following from 2 *Stansbury's North Carolina Evidence* § 170 (Brandis Rev. 1973):

> "The extrajudicial declarations of an alleged partner cannot be used (except as against himself) to prove the existence of the partnership . . . or that the declarant was engaged in the firm's business at the time . . . *But if these facts are independently established*, his declarations within the scope of his authority as a partner are admissible against other members of the partnership as well as against himself, in an action between the partnership and an outsider."

55 N.C. App. at 497, 286 S.E. 2d at 605. [Emphasis added by the Court of Appeals.]

In the case *sub judice*, there is no evidence that the defendant and Dr. Kahl were partners[2] or that Dr. Kahl made his statement to Dr. Gaddy within the scope of his authority as a partner. Rather, the evidence was that Dr. Kahl was an Associate Professor of Medicine and Cardiology at Bowman Gray School of Medicine and a staff physician at the North Carolina Baptist Hospital as a cardiologist; that Dr. Hudspeth was on the staff of the North Carolina Baptist Hospital, Cardiothoracic Surgery Section; that Dr. Kahl and the defendant have independent specialties but "work together as a team." The fact that two people work for the same organization and even that they work as a team does not establish a partnership relationship, giving rise to authority of

---

2. In *Pike v. Trust Co.*, 274 N.C. 1, 161 S.E. 2d 453 (1968) this Court extended the rule quoted above to "joint adventurers" as well as partners, accepting the definition of joint venture from *In re Simpson*, 222 F. Supp. 904, 909 (M.D.N.C., 1963) as " 'an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term.' " The evidence in this case does not show that Dr. Kahl and the defendant were "joint adventurers."

one to speak for the other. We therefore find from the evidence no relationship between Dr. Kahl and the defendant which would make statements of Dr. Kahl the vicarious admissions of the defendant.[3]

We also reject the plaintiff's contention that the statements attributed by Dr. Gaddy to Dr. Kahl were declarations against Dr. Kahl's interests. Dr. Kahl was not a party to the action; therefore the admission of his out-of-court statement was dependent upon his unavailability, upon the statement being against his own interests when made, and upon his awareness that the statement was against his interests. 1 *Brandis on North Carolina Evidence* § 147. Dr. Kahl was called as a rebuttal witness by the plaintiff and stated that he had no recollection of the telephone conversation with Dr. Gaddy. We need not decide in this case whether the inability to recall a conversation which Dr. Gaddy said took place made Dr. Kahl "unavailable," for we do not find that the statements contained in the conversation as described by Dr. Gaddy qualify as statements against Dr. Kahl's interests. The substance of the conversation as described by Dr. Gaddy was as follows:

> I was informed by Dr. Kahl that the surgery on Mr. Donavant had gone well, although there had been some degree of delay initially because of having to go from one leg to the other to harvest adequate veins and that the post-surgical, the surgery itself went fine, but that he underwent an emergency catheterization after surgery because of concern that the valves, that the veins were not properly reversed, that they were in backwards so to say. He told me that he underwent the catheterization, that the catheterization showed that all of the grafts were open, all of the grafts had good flow, but that they were indeed not reversed properly, but because of the incompetent veins, it really didn't

3. We can conceive of working arrangements where, although the persons involved are not "partners" or "joint venturers," one person either expressly or impliedly authorizes another to speak for him. We have found no cases recognizing in North Carolina that hearsay statements made by one person impliedly authorized to speak on a subject for another may be received in evidence as an admission of the authorizing person. *See* N.C.G.S. § 8C-1, Rule 801(d)(C). However, we do not need to decide that question, for the evidence in this case does not show that Dr. Hudspeth either explicitly or by implication because of a regular course of dealing authorized Dr. Kahl to speak for him to referring physicians regarding the subject matter of Dr. Hudspeth's treatment of and concern about their mutual patient.

make a difference because of flow. They appeared to flow well, and at that time, the decision was made, since there's flow in all grafts, to just follow the patient as he is rather than go back and reperform surgery and try to find more vein material which had already been difficult to find to begin with.

When asked whether he agreed with the decision not to do anything more, given the results shown on the angiogram, Dr. Gaddy stated: "if the patient's doing well and all grafts are open and there's blood flowing, I think the decision at that time would be to, I thought that was a reasonable decision because I didn't have any basis to say it's good or bad." Thus, the plaintiff's evidence was that another cardiologist, the one who had referred the plaintiff to Dr. Kahl, did not find *Dr. Kahl's* decision subject to criticism. Although the content of the statement suggested that Dr. Hudspeth's performance might be subject to criticism, because the declarant was Dr. Kahl and his performance as described in the statement was "reasonable," it cannot be said that "[t]he fact stated was against the declarant's interest when made, and he was conscious that it was so." *Id.*

[4, 5] Finally, the plaintiff asks that we rule that any statement made by one physician to another regarding treatment of their mutual patient is reliable, i.e., that the physician-to-physician communication establishes "circumstantial guarantees of trustworthiness," N.C.G.S. § 8C-1, Rule 803(24), which justifies reliance on the statement and its substantive use at trial. We note that in the cases decided by this Court applying the evidentiary rules which predated adoption of the North Carolina Rules of Evidence, we consistently stated that when testimony as to information relied upon by an expert is offered to show the basis for the expert's opinion, "it is not offered as substantive evidence." *State v. Huffstetler*, 312 N.C. 92, 107, 322 S.E. 2d 110, 120 (1984), *cert. denied,* 471 U.S. 1009, 85 L.Ed. 2d 169 (1985). In recognizing that "medical information obtained from a fellow-physician who has treated the same patient" is sufficiently reliable to be used by a testifying physician as a partial basis for his expert opinion, this Court emphasized that such information "is not independently admissible into evidence," *Booker v. Medical Center*, 297 N.C. 458, 479, 256 S.E. 2d 189, 202 (1979). *See also State v. Wade*, 296 N.C. 454, 464, 251 S.E. 2d 407, 412 (1979) ("We emphasize again that such testi-

mony [content of conversation with defendant to show basis for psychiatrist's opinion] is not substantive evidence."). In requesting that we recognize a general exception to the hearsay rule based upon reliability of physician-to-physician communication, the plaintiff argues that N.C.G.S. § 8C-1, Rules 803(24) and 804(5) are "no more than a codification of the principles of the Common Law theretofore existing generally, and existing particularly in North Carolina." We do not disagree with the plaintiff that even before adoption of the North Carolina Rules of Evidence this Court recognized that the list of recognized exceptions to the hearsay rule was not all inclusive and that other hearsay evidence should be allowed in cases where "necessity and a reasonable probability of truthfulness" were demonstrated. *State v. Vestal,* 278 N.C. 561, 582, 180 S.E. 2d 755, 769 (1971). Even if we were to establish a rule applicable to cases tried before adoption of the North Carolina Rules of Evidence (and therefore possibly applicable only to this case) that physician-to-physician hearsay is sufficiently reliable to justify its use as substantive evidence where necessity is demonstrated, we fail to be convinced of the necessity for its use in the case *sub judice.* "Necessity" as explained in *Vestal* meant " 'some good reasons for not requiring the appearance of the utterer.' " *Id.* In addition to other requirements, both Rule 803(24) and Rule 804(5) require that "the statement [be] more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable efforts," a requirement which minimizes the temptation to rely on hearsay evidence unnecessarily. We believe the requirement that hearsay evidence not falling within a recognized exception to the hearsay rule and offered because of "necessity and a reasonable probability of truthfulness" may be resorted to only when more probative evidence on the point cannot be procured through reasonable efforts is a salutary rule and applies to hearsay evidence offered in a trial conducted prior to the effective date of the North Carolina Rules of Evidence.

Assuming, *arguendo,* that Dr. Kahl was unavailable because of his inability to recall the conversation and that statements by one physician to another regarding past treatment of a mutual patient are sufficiently trustworthy to justify reliance upon their truthfulness, we note that in the case *sub judice,* not only was more probative evidence available of Dr. Hudspeth's concern

about the orientation of the vein grafts, evidence of statements of the concern made by him was actually presented to the jury. Mrs. Donavant testified that Dr. Hudspeth said to her after the bypass surgery and before the cardiac catheterization that,

> "In the process of putting those veins into your husband's heart, I am afraid they have been put in backwards. If that is the case, his heart will not receive the sufficient amount of blood that he needs, because the valves will block the flow of blood . . . . We have to find out. We have to find out right away if these things have been put in this way, because if he is not getting the sufficient amount of blood and oxygen to his heart, we will have to go back in and operate on him."

This is direct evidence that the defendant had expressed a concern about the unreversed position of the veins and that the concern was the reason for requesting a cardiac catheterization—the point which the plaintiff sought to prove by the hearsay statement of Dr. Kahl.

Therefore, evidence more probative of the defendant's concern about the position of the vein grafts than the hearsay statement of Dr. Kahl was available to the plaintiff, and for that additional reason it was not error for the trial judge to exclude the hearsay statement as substantive evidence at trial.

Likewise, we find that use of the portion of the statement attributed by Dr. Gaddy to Dr. Kahl that the angiogram films showed that the veins were unreversed was not "necessary," because more probative evidence of what the films showed, i.e., statements by Dr. Gaddy and Dr. Usher that they had personally reviewed the films and had concluded that they showed unreversed vein grafts, was available and was presented.

Finally, insofar as the statement of Dr. Kahl contained reference to Dr. Hudspeth's reason for requesting the post-operative cardiac catheterization, any presumption of reliability arising from the physician-to-physician communication has been rebutted by the same evidence that established to the trial judge's satisfaction that Dr. Kahl's entries in the medical records were not based upon firsthand knowledge.

### III.

We next consider the plaintiff's contention that the excluded portions of the medical records and the substance of the telephone conversation between Dr. Gaddy and Dr. Kahl were admissible as evidence of the basis for the opinion of one of the plaintiff's experts, Dr. Gaddy.

At the time of the trial in this case[4] N.C.G.S. § 8-58.14 (1981) provided as follows:

> Upon trial [an] expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless an adverse party requests, [sic] otherwise, in which event the expert will be required to disclose such underlying facts or data on direct examination or voir dire before stating the opinion. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Although N.C.G.S. § 8-58.14 does not provide that the party offering the opinion of an expert has a right to place before the jury the otherwise inadmissible facts and data upon which the expert's opinion is based, this Court in *State v. Wade*, 296 N.C. at 462, 251 S.E. 2d at 412 said:

> the pattern of [cited cases'] holdings supports the following propositions: (1) A physician, as an expert witness, may give his opinion, including a diagnosis, based either on personal knowledge or observation or on information supplied him by others, including the patient, if such information is inherently reliable even though it is not independently admissible into evidence. The opinion, of course, may be based on information gained in both ways. (2) If his opinion is admissible the expert may testify to the information he relied on in forming it for the purpose of showing the basis of the opinion.

As we have already noted, in *Booker v. Medical Center*, 297 N.C. 458, 479, 256 S.E. 2d 189, 202, this Court held that "medical information obtained from a fellow-physician who has treated the

---

4. N.C.G.S. § 8-58.14 was repealed effective 1 July 1984. 1983 N.C. Sess. Laws Ch. 1037 § 9. Rule 705 of the North Carolina Rules of Evidence contains virtually identical language.

same patient [is] 'inherently reliable' within the meaning of [the rules allowing inadmissible information to be used as a basis for an expert's opinion]." Also, the evidence showed and we take judicial notice of the fact that physicians constantly rely on medical records in making treatment decisions regarding their patients.

The medical records were first tendered as evidence during the plaintiff's examination of Dr. Hudspeth. At that time, Dr. Gaddy had not testified and the records were not offered for the limited purpose of showing the basis for Dr. Gaddy's opinion. The trial judge sustained the defendant's objection to the contested portions of the records.

Later, Dr. Gaddy was called as a witness for the plaintiff. He stated that he uses all the information he can find out about his patients to monitor and treat them. He said that he either called or was called by Dr. Kahl a few days after the plaintiff underwent surgery. When Dr. Gaddy was asked to relate the substance of the telephone conversation, the defendant objected. Again, Dr. Gaddy had not stated an opinion, and the evidence of the telephone conversation with Dr. Kahl was not offered for the purpose of showing the basis for Dr. Gaddy's opinion. Following a *voir dire* examination, the objection was sustained.

Dr. Gaddy then testified before the jury that he had a 15 to 20 minute conversation with Dr. Kahl about the plaintiff and that he subsequently received a letter from Dr. Kahl dated 2 April 1979. The defendant objected to introduction of the previously-excluded portion of the letter and the trial judge conducted another *voir dire*. Dr. Gaddy responded affirmatively to plaintiff's counsel's question on *voir dire*: "Do you rely on the entire contents received in this letter or any other letter *for part of your medical treatment of patients*?" (Emphasis added.) The defendant's objection to the letter was sustained.

Somewhat later the plaintiff attempted to introduce through Dr. Gaddy the 29 March 1979 catheterization report and the reason stated therein for the catheterization. Again, the offer was not limited, and Dr. Gaddy had not indicated that he had formed an opinion which was based in part upon the report. The defendant's objection was sustained.

Donavant v. Hudspeth

The examination of Dr. Gaddy continued, and eventually he stated the following opinion and his bases therefor:

Based on the testimony of Dr. Usher,[5] the angiograms which I have reviewed, the discourses that I have had with Dr. Usher, hospital records, conversations with Dr. Kahl, and the overall doctor-patient relationship with Mr. Donavant since March of 1979, it is my opinion that Mr. Donavant's veins were sewn in in a non-reversed manner, that is, backwards. It is my opinion to a reasonable degree of medical certainty that this was a very major and very probably the major factor in Mr. Donavant's grafts closing.

. . . .

My impression . . . was that all the veins put in by Dr. Hudspeth were in backwards, including the vein that was still patent and left in by Dr. Johnson when he operated on plaintiff in Milwaukee.

The plaintiff did not ask at that time that the witness further describe the bases for his opinion; neither did he request that previously-excluded evidence be received for the limited purpose of showing the basis for the opinion. *See Freeman v. Ponder*, 234 N.C. 294, 67 S.E. 2d 292 (1951). Rather, the following exchange took place:

Q. When did you first form the opinion that you have rendered? When did you first form the opinion that these veins were sewn in without being properly reversed.

MR. ELSTER: Well . . .

THE COURT: Is there an objection?

MR. ELSTER: Yes, sir. I object.

(The jury left the courtroom, voir dire questions were asked, and the matter argued by counsel.)

5. Dr. Usher, a cardiologist at Medical University of South Carolina, examined the angiograms of the postoperative catheterization (which were lost when he mailed them back to North Carolina). Although his testimony is not in the record before this Court, from the plaintiff's brief and the trial judge's instructions to the jury, it is clear that he stated that he formed the opinion that the venous valves in one graft were pointed in the wrong direction, and this apparently is the testimony to which Dr. Gaddy referred.

Donavant v. Hudspeth

VOIR DIRE EXAMINATION by Mr. Mann in the absence of the jury: (Witness would have testified as follows:)

EXCEPTION NO. 10

Q. Doctor, when did you first form your opinion?

A. Within the first two or three days after surgery.

Q. As a result of what?

A. As a result of a phone conversation between Dr. Fred Kahl and me.

Q. That was the telephone call that you —

A. I think we — it's the same telephone conversation that I have discussed earlier in which I was told by Dr. Kahl —

Q. You don't have to tell us again, but it's the same one you testified to His Honor outside the presence of the jury?

A. I was told by the cardiologist that I referred to that this is what happened and that's the earliest formulation of my opinion.

Q. Has your opinion been confirmed by the data and supported by all of the data that you've seen since that time?

A. I have seen nothing that changes my opinion.

Q. All right.

COURT: The objection will be sustained.

The jury returned and the record reveals no further questions of Dr. Gaddy during the plaintiff's case in chief.

Although the plaintiff's counsel did not explicitly offer, during the exchange just related, to introduce the substance of the telephone conversation between Dr. Kahl and Dr. Gaddy as the basis for Dr. Gaddy's opinion, it is obvious that such was the purpose for his question. However, the effect of the questions was to allow Dr. Gaddy to express to the jury, not an opinion based upon all of the information identified in his earlier statement, but an opinion based *solely* on his conversation with Dr. Kahl in which, according to Dr. Gaddy, Dr. Kahl had said that a cardiac catheterization had been requested because of a concern that the veins

had been sewn in unreversed and that the resulting angiograms revealed that the veins had indeed been sewn in backwards.

[6]  The trial judge properly excluded any statement by Dr. Gaddy regarding an "opinion" based *solely* on the statement of Dr. Kahl, for at that time Dr. Gaddy had not in fact formed an independent opinion but had merely adopted an opinion allegedly formed by another cardiologist. While we have held that *facts and data* known to and provided by other health care professionals to physicians may be considered reliable and may be used by the physician in forming his expert opinion, *State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110 (1984), we have required that the opinion be one formed by the physician relying "on his personal knowledge and expertise," *State v. Smith*, 315 N.C. 76, 101, 337 S.E. 2d 833, 849 (1985) (applying N.C.G.S. § 8C-1, Rule 703). *See also State v. Mize*, 315 N.C. 285, 337 S.E. 2d 562 (1985) (hospital records including a report by a psychiatrist of observations of the defendant relied upon by second psychiatrist in forming his opinion) (applying N.C.G.S. § 8C-1, Rule 705); *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398 (1983). In the conversation related by Dr. Gaddy, no facts and data were given to him by Dr. Kahl; Dr. Kahl merely stated a conclusion that the veins were in backwards. His mere statement of a conclusion is an insufficient basis for the formation of an independent opinion by Dr. Gaddy. Therefore, the trial judge did not err in sustaining the defendant's objection to Dr. Gaddy's "opinion" based solely upon the conversation with Dr. Kahl and in excluding the conversation as the basis for that opinion.

Dr. Gaddy was recalled by the plaintiff on rebuttal and testified as follows:

Q.  Dr. Gaddy, when you previously testified in this case, you rendered an opinion and cited as the basis for that opinion, a number of things, included among which was a conversation you had some time between March 29 and April 2 with Dr. Kahl. To what extent did you rely on that conversation in rendering your opinion?

A.  Significantly.

Q.  When did you form the opinion, first form your opinion?

A.  The first phone conversation.

Q. I ask you to tell the Court and the jury the substance of that telephone conversation.

MR. ELSTER: Objection, Your Honor. Same grounds.

COURT: Objection's sustained.

If allowed to answer, Dr. Gaddy would have related a conversation which included the following:

I was told . . . that the surgery went fine, and this patient was doing well, but there was—that an emergency catheterization was performed immediately after surgery because of concern that the valves—the veins were put in, put in such a position that the valves were not reversed properly; that this catheterization was performed; that all grafts were open; that there was good flow; and that, indeed, the valves were in place, were discernible and were in backwards, but were incompetent thereby allowing good flow . . .

We have recited at some length the course of the trial to show that at no time did the plaintiff offer for use in showing the basis for Dr. Gaddy's opinion any of the contested evidence except the telephone conversation between Dr. Kahl and Dr. Gaddy. Therefore, the plaintiff's claim that the trial judge erred in not admitting the medical records for that purpose is overruled. *See State v. Gardner*, 311 N.C. 489, 319 S.E. 2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369 (1985); *Colonial Pipeline Co. v. Weaver*, 310 N.C. 93, 310 S.E. 2d 338 (1984); 1 *Brandis on North Carolina Evidence* § 27 (Supp. 1986).

Also, we note that the plaintiff's offer of the telephone conversation as a partial basis for Dr. Gaddy's opinion occurred during rebuttal and, within the discretion of the trial judge, was excludable as beyond the scope of rebuttal. *State v. Boykin*, 298 N.C. 687, 259 S.E. 2d 883 (1979), *cert. denied*, 446 U.S. 911, 64 L.Ed. 2d 264 (1980); *Gay v. Walter*, 58 N.C. App. 360, 283 S.E. 2d 797, *reh. on other grounds*, 58 N.C. App. 813, 294 S.E. 2d 769 (1982); *Castle v. Yates Co.*, 18 N.C. App. 632, 197 S.E. 2d 611 (1973); 6 J. Wigmore, *Evidence* § 1873 (Chadbourn Rev. 1976). However, based upon further questions asked by the trial judge and the statement of defendant's counsel that his objection was on the "[s]ame grounds," it appears that the objection was sustained on the basis that the telephone conversation was hearsay.

The question thus facing this Court is whether information acquired from a presumptively reliable source, such as another treating physician or a medical record, and used by an expert witness in forming an opinion is admissible as the basis for the expert's opinion regardless of the trial court's determination that the particular information was derived from an unreliable source.

[7] We hold that, although generally statements by one treating physician to another are inherently reliable and may be used as the basis for an expert opinion and are admissible in evidence to show the basis for the expert opinion, when the trial judge determines on *voir dire* that the source of the physician's statement is in fact unreliable, he may exclude the statement as evidence for any purpose. If the opinion of the physician testifying as an expert is based solely on the unreliable statement, the physician should not be allowed to state the opinion. If, on the other hand, the opinion is based upon sufficient additional, reliable facts and data, the trial judge may allow the expert to state his opinion notwithstanding his statement that he also relied in part upon unreliable information.

In the case *sub judice*, the unreliability of Dr. Kahl's statement regarding the reason for the emergency catheterization was determined by the trial judge when he excluded portions of the medical records offered under the business records exception to the hearsay rule. Therefore, his exclusion of the similar portion of the telephone conversation as a basis for Dr. Gaddy's opinion also was proper.

A different situation exists with regard to the other portion of the telephone conversation, however, for Dr. Gaddy stated that Dr. Kahl said that he had performed the catheterization and viewed the angiogram and "indeed, the valves were in place, were discernible and were in backwards." While we said earlier in this opinion that one physician may not base his opinion *solely* on the statement of opinion of another physician, when a physician as an expert witness bases an opinion upon reliable information *including* a consistent opinion of another physician, the second physician's opinion is admissible. *See State v. Mize*, 315 N.C. 285, 337 S.E. 2d 562.

In the case *sub judice*, Dr. Gaddy testified that his opinion that the veins were put in backwards was based upon his own re-

view of the angiogram films as well as the consistent testimony of Dr. Usher and the statements of Dr. Kahl. Therefore, if the plaintiff had offered into evidence only that portion of Dr. Kahl's telephone conversation which related his evaluation of the angiogram films, it would have been admissible. However, when an offer of evidence is made, some of which is admissible and some of which is inadmissible, it is not the responsibility of the trial judge to separate the admissible from the inadmissible evidence, and in the absence of an appropriately-limited offer by the proponent of the evidence, the trial judge's ruling excluding the evidence will be upheld on appeal. *Branch v. Dempsey*, 265 N.C. 733, 145 S.E. 2d 395 (1965).

We also have carefully examined the record in this case and conclude that admission of the contested portions of the evidence *for the limited purpose of showing the basis for Dr. Gaddy's opinion* would not likely have changed the result. Dr. Gaddy, like Dr. Kahl, is a cardiologist. He stated that "Reading and interpreting angiograms is one of the primary responsibilities of a cardiologist." He also stated that he had viewed the angiogram films of the 29 March 1979 cardiac catheterization and that "there were definitely vein venous valves which were not oriented in the proper position." Therefore, Dr. Gaddy's opinion was based largely on his firsthand observation of the best evidence of the vein orientation. His opinion was bolstered by similar opinions by Dr. Usher, who also had viewed the angiogram films, by Dr. Johnson, who had performed the second bypass surgery, and by the testimony of Mrs. Donavant that Dr. Hudspeth had personally expressed his concern to her about the vein orientation.

We cannot determine from the verdict whether the jury was unconvinced that the veins were sewn in backwards or whether they believed that, although the veins were backwards, because the valves were "incompetent," the failure to reverse the veins made no difference and the blood flow was not impeded. We do not believe that Dr. Gaddy's opinion would have been rendered more acceptable to the jury if more detailed bases for his opinion had been admitted; however, it is possible that, had the contested evidence been admitted, the jury would have used it to impeach the testimony of Dr. Hudspeth—an improper purpose. Therefore, even if technically admissible for a limited purpose, the evidence could properly have been excluded by the trial judge on the basis

that the probative value for the proper purpose for which it was receivable was outweighed by its prejudicial effect.

This assignment of error is overruled.

## IV.

The plaintiff contends that the trial judge erred in sustaining objections to certain questions asked on cross-examination of Dr. Cordell, a witness for the defendant.

Dr. Cordell testified that he had reviewed the medical record in the case and in his opinion "the actions taken by Dr. Hudspeth on March 29, 1979, were in all respects appropriate and well within the local standard of care." He also testified that he was Chairman of the Department of Thoracic and Cardiovascular Surgery at Baptist Hospital and "a long term friend of the defendant Dr. Hudspeth[;] we work together on the staff."

The plaintiff was not allowed to place before the jury the witness's answer to the question "Dr. Cordell, did you ever criticize Dr. Kahl in any way for the record keeping in this case?" If permitted to answer, Dr. Cordell would have stated that he did criticize Dr. Kahl "for not having better information to go into his hospital record."

Also, when Dr. Kahl was called as a rebuttal witness by the plaintiff, the trial judge ruled that plaintiff's counsel could not question him concerning Dr. Cordell's criticism of his record keeping.

The plaintiff contends that evidence that Dr. Cordell criticized Dr. Kahl for his record keeping regarding the patient in the case *sub judice* and regarding a patient of Dr. Cordell's shows that Dr. Cordell was biased because "Dr. Cordell, a key defense witness, obviously did not want anything in any medical record that might be construed helpful to a plaintiff in a subsequent malpractice action." We have reviewed the questions and answers contained in the *voir dire* examinations of Dr. Cordell and Dr. Kahl and do not find therein anything that suggests that Dr. Cordell criticized Dr. Kahl for placing accurate information in his records which would be helpful to a patient in a malpractice action. His criticism regarding the records of the plaintiff related to the inclusion of the information which the trial judge found to be unreliable.

"The extent of cross-examination with respect to collateral matters is largely within the discretion of the trial court." 1 *Brandis on North Carolina Evidence* § 42. We hold that the trial judge did not abuse his discretion in excluding the testimony regarding Dr. Cordell's criticism of Dr. Kahl's record keeping. No question of Dr. Cordell's bias against Dr. Kahl as a witness for the plaintiff is asserted by the plaintiff. Dr. Cordell's bias in favor of the defendant was clearly established by his admission that they were long term friends and co-workers. We agree with the Court of Appeals that exclusion of this evidence was not prejudicial to the plaintiff.

### V.

Finally, plaintiff challenges the jury instructions, arguing that the pattern jury instructions were similar to those which this Court disapproved in *Wall v. Stout*, 310 N.C. 184, 311 S.E. 2d 571 (1984). Plaintiff concedes that no objection was taken to the instructions as given and that the case was tried prior to the *Wall* decision. By failing to call the trial court's attention to alleged errors in the jury charge, plaintiff has waived his right to appellate review. N.C. R. App. P. 10(b)(2); *Durham v. Quincy Mutual Fire Ins. Co.*, 311 N.C. 361, 317 S.E. 2d 372 (1984).

The decision of the Court of Appeals is reversed and the case is remanded to that court for further remand to the trial court for reinstatement of the verdict and judgment.

Reversed and remanded.

Justice MARTIN concurring.

I concur in the result reached. Had the case been tried under the new North Carolina Rules of Evidence, Chapter 8C of the General Statutes of North Carolina, I would find the challenged evidence to be admissible.