**Roger EDMONDSON, Plaintiff,**

v.

**AMERICAN MOTORCYCLE ASSOCIATION, INC., an Ohio not for profit corporation, a/k/a American Motorcyclist Association; and Paradama Productions, Inc., an Ohio corporation, d/b/a AMA Pro Racing, Defendants.**

**No. CIV. 1:96CV235.**

United States District Court,
W.D. North Carolina,
Asheville Division.

Feb. 10, 1999.

George Ward Hendon, Martin K. Reidinger, Adams, Hendon, Carson, Crow & Saenger, P.A., Asheville, NC, David S. Atlas, Red Bank, NJ, for plaintiff.

John H. Hasty, Waggoner, Hamrick, Hasty, Monteith & Kratt, PLLC, Charlotte, NC, Edward A. Matto, Elizabeth Watts, Bricker & Eckler LLP, Columbus, OH, for defendants.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendants' post-trial motions for judgment as a matter of law or, in the alternative, for a new trial or remittur. The Plaintiff opposes the motions which, for the reasons stated herein, are denied.

## I. PROCEDURAL BACKGROUND

After a six day trial, the jury found the Defendants converted a mailing list owned by the Plaintiff, wrongfully interfered with Plaintiff's contractual rights in 1995, converted business assets brought to a 1994 joint venture, and breached their fiduciary duty to the Plaintiff. The jury also answered issues concerning the Plaintiff's claim for unfair competition in his favor. The Court subsequently found the conduct stated in the issues constituted unfair competition in violation of North Carolina law. The jury awarded Plaintiff punitive damages of $1 million, but he elected to have his damages trebled pursuant N.C. Gen. Stat. § 75, *et seq.* Judgment was entered on December 30, 1998, for $2,790,000 in favor of the Plaintiff.

## II. DISCUSSION

### A. The Standards of Review.

■ Judgment as a matter of law is proper "when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." In reviewing the district court's decision, we consider the evidence in the light most favorable to the nonmovant to determine whether the evidence presented at trial was sufficient to allow a reasonable jury to render a verdict in the nonmovant's favor. *Princess Cruises, Inc. v. General Electric Co.,* 143 F.3d 828, 831 (4th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 444, 142 L.Ed.2d 399 (1998) (citations omitted). In making that assessment, all reasonable inferences are given the nonmovant and no decision may be based on materially contradictory evidence. *Al–Zubaidi v. Ijaz,* 917 F.2d 1347, 1348 (4th Cir.1990), *cert. denied,* 499 U.S. 960, 111 S.Ct. 1583, 113 L.Ed.2d 648 (1991).

On review of a motion for new trial, we are permitted to weigh the evidence and consider the credibility of witnesses. A new trial will be granted if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict."

*Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir.1998) (quoting *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir.1996)).

The standard of review for allegedly inconsistent verdicts is well established. When the use of a special verdict form leads to apparently conflicting jury findings, the court has a duty under the seventh amendment to harmonize the answers, if it is possible to do so under a fair reading of them. The Supreme Court has stated: "We must therefore attempt to reconcile the jury's findings, by exegesis if necessary, ... before we are free to disregard the jury's verdict and remand the case for a new trial." In attempting to reconcile special verdicts, a court should look beyond the face of the interrogatories to the court's instructions.

*Gosnell v. Sea–Land Service, Inc.,* 782 F.2d 464, 466–67 (4th Cir.1986) (quoting *Gallick v. B & O R.R. Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963)) (other citations omitted).

■ "[J]ury determinations of factual matters such as ... the amount of compensatory damages will be reviewed ... by determining whether the jury's verdict is against the weight of the evidence or based on evidence which is false.'" *Cline,* 144 F.3d at 305 (quoting *Atlas Food Sys.,* 99 F.3d at 594).

## B. Plaintiff's cause of action for conversion of the mailing list.

■ Plaintiff's first cause of action was for conversion of a mailing list which he had developed in the context of his business, Championship Cup Series (CCS). This list contained not only past participants in races sponsored by CCS but potential participants in future events, including amateur racers who might become professional. Defendants argue the complaint alleged conversion of a trade secret in the form of a mailing list. However, they complain, the jury was never instructed on the North Carolina law of trade secrets.[1]

In the first claim for relief alleged in the Plaintiff's complaint, the mailing list was described as both a business asset and a trade secret under North Carolina law. However, the cause of action was based on conversion of the business asset which took the form of the mailing list; the claim was not based on conversion of a trade secret. Complaint, at ¶'s 53–55 ("The copying and use of the Edmondson Mailing List by the Defendant AMA constitutes a conversion of a *business asset* of the Plaintiff. The use of the Edmondson Mailing List by Defendant Paradama for the purposes of supporting its races constitutes a further conversion of a *business asset* of the Plaintiff. As a proximate result of the wrongful actions of the Defendants, Plaintiff has sustained damages in an amount in excess of $10,000 consisting of the value of the *asset* so converted, and the monetary value of the competitive advantage lost by the obtaining of this *asset* by a competitor of Plaintiff, and the value of the benefit to the Defendants in obtaining said *asset* without cost or effort in the development

---

1. Defendants have argued variously that both Ohio and North Carolina law applied in this case. In the Defendants' trial brief, it was conceded that North Carolina law applied to every cause of action except that for unfair competition. During charging conferences, it was agreed that the essential elements of each cause of action except the claim for unfair competition under N.C. Gen.Stat. § 75–16 were identical under Ohio and North Carolina law. *Compare, Tabar v. Charlie's Towing Service, Inc.,* 97 Ohio App.3d 423, 646 N.E.2d 1132 (1994) (setting forth the essential elements of a claim for conversion) *with* N.C.P.I. Civil § 806.00; *Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 419, 650 N.E.2d 863, 866 (1995) (setting forth the essential elements for tortious interference with contract) *with* N.C.P.I. Civil § 807.00; *Burr v. Bd. of County Comm'rs. of Stark County,* 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986); *Hanes v. Giambrone,* 14 Ohio App.3d 400, 406, 471 N.E.2d 801, 807 (1984) (setting forth the essential elements of constructive fraud) *with* N.C.P.I. Civil §§ 800.00, 800.05, & 800.06.

of the same.") (emphasis added). At no point does the complaint seek relief for conversion of a trade secret.

Moreover, the evidence at trial related to efforts taken by the Defendants to obtain the list. Roy Jansen, AMA's director of competition, testified by video deposition that without the mailing list, AMA would have to start from "Square One." As a result, an AMA official who worked at the CCS offices was to obtain the information, including the name of amateur racers, by downloading the list from the Plaintiff's field computer. And, the Defendants finally obtained the list when the Plaintiff turned over a set of mailing labels with the understanding the labels would not be duplicated. The labels, obviously, were the mailing list. Plaintiff moved at the close of his evidence to conform his pleadings to the evidence produced at trial; a motion which was granted. The issue thus became whether he had proved evidence that the Defendants converted the mailing list, not a trade secret. The jury, which was instructed on the law of conversion, found first, that the Plaintiff owned a business asset called a mailing list and second, that the list was converted by the Defendants. The trade secret status of the list was not in issue and was not an essential element of the claim.

Defendants next repeat an argument rejected in their summary judgment motion: the information in the mailing list was available to them by reviewing software jointly owned by the parties; thus, there could be no conversion. And, they argue that since the Plaintiff voluntarily turned over the mailing labels, there could be no conversion. The jury heard both versions of the evidence and obviously believed the Plaintiff's version as well as his evidence concerning the value of the list. Nor does Defendants' argument justify a new trial.

## C. The cause of action for tortious interference with contract.

■ The Defendants also claim the evidence does not support the jury's finding that they interfered with Plaintiff's con-

tractual rights in 1995. Defendants' argument is that the race track owners made independent decisions about what was best for their businesses; the fact that they determined not to do business with the Plaintiff does not rise to the level of interference with contract rights.

John Szymanski's video deposition was introduced at trial. He was the marketing manager of the Mid–Ohio Race Track, one of the premiere road-racing tracks in the United States. He testified that when the track owners heard of the dispute between the Plaintiff and AMA, they told AMA officials how important they felt the Plaintiff was to the industry. Later, they learned that AMA was forcing the Plaintiff out and became disenchanted with AMA. As a group, they decided to do business with the Plaintiff. Thereafter, the motorcycle manufacturers called to say they would not do business with the tracks unless the owners gave their business to AMA instead of to the Plaintiff. Suddenly, AMA planned events during the same weeks as Plaintiff's events were scheduled and sponsors were lost. As a result, Mid–Ohio had no choice but to go with AMA instead of the Plaintiff.

The manager of Brainerd International Raceway testified he also had planned to do business with the Plaintiff but once Mid–Ohio went back to AMA, he had no choice but to do the same. AMA was setting up races for the same dates as the races scheduled with the Plaintiff. And, they could not hold races without the manufacturers' participation. The manager of Road America Race Track reiterated this testimony. To accept the Defendants' arguments and grant judgment as a matter of law would substitute the Defendants' theory of the case for the jury's credibility decisions. That may not be done. And, as noted above, Defendants' theories do not warrant a new trial.

## D. The cause of action for conversion of Plaintiff's interest in the 1994 joint venture.

■ The last joint venture between the parties was in 1994. Plaintiff claimed the

Defendants converted assets he brought to the joint venture and the jury agreed. Defendants argue the verdict sheet failed to have the jury identify the particular assets converted.[2] "The overwhelming weight of the evidence is that he brought only his management skills" to the joint venture. Defendants' Motion for Judgment as a Matter of Law, at 12. Thus, the Defendants argue there could be no conversion.

The evidence at trial showed that when the joint ventures were formed, Plaintiff brought to the venture the Supersport, Endurance and United States TwinSports classes of races; AMA brought the Superbike, ProTwins and 250 GP classes of races to the venture. In addition, AMA and the Plaintiff had a separate agreement pursuant to which he managed all classes of AMA's races. Plaintiff testified extensively concerning his negotiations with AMA for the purchase of his interest in the joint venture. When the Plaintiff explained his position to the Board of Trustees, one trustee said that AMA would simply take the business from him without paying anything. The next day, AMA ran television ads in which they listed CCS classes of races as being sponsored and run by AMA. Other press releases stated that AMA was now running the Plaintiff's business. Later, Plaintiff thought he and AMA had reached an agreement in principle and he began to transfer his assets to AMA. He sent AMA his programs and transferred the entries he had already received for races. He introduced their employees to race sponsors. And, finally, believing the parties had reached an agreement in principle, he turned over the mailing list in the belief it would not be duplicated.

Ed Youngblood was the president of AMA at the time. His memorandum to the Board of Trustees for AMA written November 1, 1993, was admitted into evidence at trial. Youngblood proposed to the Board that the Plaintiff's interest in the joint venture be purchased by AMA.

Mr. Edmondson's role, beginning as a consultant, has been formalized under a Race Manager Agreement. His ability to focus exclusively upon the problems of running the National Championship Series [for AMA] while remaining in touch with the CCS program ... has provided a useful perspective leading to continuing change, flexibility, and improvement in quality. New ideas have been tried and worked out in the low-tension CCS club racing environment before implementation on the national championship level.... As event officials became more confident and capable of handling minute by minute event management, Mr. Edmondson has been asked to turn more of his attention to dealing with the National Championship promoters. *This has been made necessary in part because of the instability of management we have experienced in the VP Sports Marketing position. That position has come vacant at the most inopportune times, requiring us to rely on Mr. Edmondson as the only individual with knowledge and appropriate status to deal with the promoters as we develop the subsequent year's schedule.* Again, his experience as a promoter of his own CCS Series has given an awareness of the promoter's financial risk that I believe has enabled him to negotiate deals and find solutions that have resulted in an improved relationship between the AMA and its road racing promoters.... These circumstances led in 1990 to the development of a joint venture agreement. It was acknowledged that the CCS had greatly improved the AMA's national championship weekend and *that certain classes had in fact been developed and brought to the mix by CCS....* All parties agree that the Race Manager Agreement has brought a level

---

**2.** The Court rejects the Defendants' argument that it was error to fail to require the jury to identify the assets or interests. Defendants' presentation of the issues for the jury was unnecessarily detailed and complicated and, therefore, created juror confusion.

of professionalism that the AMA never could have achieved under the old regional referee system. All parties agree that the Joint Venture Agreement has created a package that has made AMA road racing more competitive against other leading motorsports among promoters, circuits, and the media ... *Consequently, it was agreed on October 15 that the AMA would offer to buy out the Joint Venture Agreement and that the parties would work in good faith toward a resolution* that could be placed before the AMA Board of Trustees....

Plaintiff's Exhibit 102 (emphasis added).

▇▇▇▇ Thus, according to a high ranking official at AMA, Plaintiff brought his reputation, his management skills, his patronage and his separate classes of races to the joint venture. In essence, Plaintiff brought his good will to the joint venture and AMA wanted to buy that good will. " 'Good will' is a property right which consists of intangibles associated with favorable community relations and identification of the business name." *Budd Tire Corp. v. Pierce Tire Co., Inc.,* 90 N.C.App. 684, 688, 370 S.E.2d 267, 269 (1988). The development or improvement of customer relations is good will. *United Laboratories, Inc. v. Kuykendall,* 322 N.C. 643, 652, 370 S.E.2d 375, 382 (1988). According to AMA's president, the Plaintiff brought good will *and* his race classes to the venture and went on to develop new business interests and assets during the duration of the joint venture. This exhibit alone disproves the Defendants' position.

Moreover, everyone who testified at the trial affirmed the Plaintiff's acumen in managing the races, crediting him with almost singlehandedly turning motorcycle racing into a booming business. Despite the Defendants' claim that Plaintiff brought nothing more than management skills to the venture, good will is an asset. *Budd Tire, supra* (" 'Good will' is as much an 'asset' as equipment, machinery or oth-

er tangible property."); *Donavant v. Hudspeth,* 318 N.C. 1, 16, 347 S.E.2d 797, 806, n. 2 (1986) (A joint venture is " 'an association of persons with intent, by contract express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, but without creating a partnership in the legal or technical sense of the term.' "). The jury found Plaintiff brought assets or interests to the venture. AMA has acknowledged this by written evidence and the Defendants' position in this motion would require the Court to substitute their version of the evidence for the jury's findings.

▇▇ Defendants also claim it was error to allow any evidence on the cause of action for conversion beyond the written terms of the 1994 joint venture contract. Paragraph 19 of the joint venture agreement provides: "The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Ohio, applicable to agreements made and to be performed in such state." Defendants cite an Ohio case holding that parol evidence may not be received when the parties have entered into a clear, unambiguous contract.[3] Thus, Defendants argue all evidence of conversion should have been excluded. However, the cause of action for conversion is not based on contract, but tort. *Baker v. Rushing,* 104 N.C.App. 240, 409 S.E.2d 108 (1991) (conversion is a tort); *Taha v. Thompson,* 120 N.C.App. 697, 463 S.E.2d 553 (1995) (recognizing cause of action for conversion when landlord refused to allow tenant to remove personal property although plaintiff also sued for breach of contract), *review denied,* 344 N.C. 443, 476 S.E.2d 130, 131 (1996). And, the parol evidence rule does not apply to actions sounding in tort. *Love v. Keith,* 95 N.C.App. 549, 553, 383 S.E.2d 674, 677 (1989), *overruled on other*

---

3. This position is inconsistent with the Defendants' trial brief and acknowledgment during the trial that North Carolina law applies to the cause of action for conversion.

*grounds by, Custom Molders, Inc. v. American Yard Products, Inc.,* 342 N.C. 133, 463 S.E.2d 199 (1995).

Nor does the Defendants' argument that the conversion claim arises from the performance of the contract carry weight. The evidence adduced at trial was that after the termination of the last joint venture agreement in 1994, AMA converted the Plaintiff's good will and race classes by promoting and representing them as its own. The jury believed this evidence and rejected the Defendants' position. And, Defendants' arguments are not a basis for a new trial.

 In the Defendants' trial brief, they raised for the first time an argument that the conversion claim must be dismissed because the only relief available to the Plaintiff is an action for dissolution of the joint venture pursuant to Ohio law. That claim is repeated here, albeit only as to the third cause of action for conversion as to which the jury rendered a verdict of $750,-000 in damages. Defendants' position is that the choice-of-law provision in the joint venture agreement requires Ohio law to be applied and under Ohio law, an action at law may not be brought until the venture is dissolved and an accounting has occurred. *See, e.g., Dunn v. Zimmerman,* 69 Ohio St.3d 304, 631 N.E.2d 1040 (1994).

However, the cause of action for conversion of assets was not based on the validity, interpretation, construction or performance of the agreement. Therefore, the parties' choice-of-law provision in the contract does not control. *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42 (4th Cir. 1983) (Choice of law provision in contract disregarded because the nature of the liability sought to be imposed was *ex delicto* [from a tort] not *ex contractu* [from the contract] ), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985); *Robinson v. Ladd Furniture, Inc.,* 995 F.2d 1064(table), 1993 WL 211309 at *4–5 (4th Cir.1993) (citing *Simms Inv. Co. v. E.F. Hutton & Co.,* 699 F.Supp. 543 (M.D.N.C. 1988) ("It is not enough simply to decide that this clause is enforceable in the abstract; we must also determine whether it is enforceable against these particular claims.")); *United Dominion Indus., Inc. v. Overhead Door Corp.,* 762 F.Supp. 126, 127 (W.D.N.C.1991) (Rejecting choice-of-law provision in a contract because the cause of action did not arise out of the contract); *United Virginia Bank v. Air-Lift Assoc., Inc.,* 79 N.C.App. 315, 320, 339 S.E.2d 90, 93 (1986) (Where the claim sounds in tort, not contract, the choice-of-law provision does not apply). The issue then is what law does apply.

"A federal court sitting in diversity must apply the forum state's choice-of-law rules." *In re Nantahala Village, Inc.,* 976 F.2d 876, 880 (4th Cir.1992); *New England Leather Co. v. Feuer Leather Corp.,* 942 F.2d 253, 255 (4th Cir.1991). "Tort claims are governed by the law of the state in which the injuries were sustained." *Wysong & Miles Co. v. Employers of Wausau,* 4 F.Supp.2d 421, 425 (M.D.N.C. 1998) (citing *Boudreau v. Baughman,* 322 N.C. 331, 335–36, 368 S.E.2d 849, 854 (1988)). Plaintiff has always been a North Carolina resident; he always operated his business, CCS, from his North Carolina office. Although AMA is an Ohio corporation, the business aspects of the joint venture were not centered in Ohio because the Plaintiff operated the joint venture from North Carolina. Moreover, Plaintiff functioned as the race manager for the AMA classes of races as well. The races occurred at various locations throughout the country, including two held in North Carolina. However, the injury which occurred when Plaintiff's assets were converted occurred in North Carolina where he resided and from which he conducted the bulk of the business.

Moreover, under either Ohio or North Carolina law, the Plaintiff had the right to bring this action for conversion prior to seeking a dissolution of the venture and an accounting.

"A joint [venture] is in the nature of a kind of partnership, and although a partnership and a joint [venture] are distinct relationships, they are governed by substantially the same rules." The Court of Appeals correctly looked to partnership law, codified in the Uniform Partnership Act [hereinafter "UPA"], for guidance in resolving this issue. Section 59–38(a) of the UPA provides: "All property originally brought into the partnership stock or subsequently acquired by purchase or otherwise, on account of the partnership, is partnership property." [ ] This principle holds true for property bought on account of a joint venture.

*Jones v. Shoji*, 336 N.C. 581, 585, 444 S.E.2d 203, 205 (1994) (citations omitted). It is true, as the Defendants urge, that "[a]s a general rule, one partner cannot sue another partner at law until there has been a complete settlement of the partnership affairs and a balance struck." *Roper v. Thomas*, 60 N.C.App. 64, 70, 298 S.E.2d 424, 428 (1982), *review denied*, 308 N.C. 191, 302 S.E.2d 244 (1983). But there are exceptions and one exists when partnership property is being wrongfully converted. *Id.*, at 70–71, 298 S.E.2d at 428. Indeed, Ohio follows the same rule. *Dunn v. Zimmerman, supra* (suit may be maintained prior to accounting if an accounting would be futile or the claim is for breach of a fiduciary duty or wrongful appropriation of property). The Defendants' arguments on this score are therefore rejected.

### E. The cause of action for constructive fraud.

■ The jury found the Defendants constructively defrauded the Plaintiff in connection with contracts for television coverage of races during the joint venture. Defendants argue there was insufficient evidence to sustain this verdict. The Plaintiff testified, and the evidence showed, that pursuant to the venture agreements, Plaintiff paid $10,000 per race for television coverage. However, he was unaware that AMA had negotiated television production agreements pursuant to which it was paid large sums to allow such coverage instead of paying for the coverage. Yet, AMA continued to charge the joint venture for coverage for which AMA was, in fact, being paid. Plaintiff's testimony was corroborated by that of Richard Maxwell, the Vice President of Professional Racing with AMA during the time at issue. The jury verdict is amply supported by the evidence.

### F. The cause of action for unfair competition.

■ Defendants next argue that a claim for unfair competition pursuant to N.C. Gen.Stat. § 75–16 should not have been submitted to the jury because Ohio law controls this claim. As noted above, "[t]o decide the choice of law issue, [the court should] apply the choice of law rules of the forum state, North Carolina." *New England Leather Co.*, 942 F.2d at 255. North Carolina courts have used two different methods in claims involving unfair and deceptive trade practices: the law of the state where the last act occurred giving rise to the injury, *United Virginia Bank v. Air–Lift Associates, Inc., supra*, and the law of the state having the most significant relationship to the occurrence giving rise to the action, *Andrew Jackson Sales v. Bi–Lo Stores, Inc.*, 68 N.C.App. 222, 314 S.E.2d 797 (1984). The North Carolina Supreme Court has not addressed the issue but Fourth Circuit cases interpreting North Carolina law have concluded that the "most significant relationship" test should be used. *See, e.g., New England Leather, supra; Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 951 F.Supp. 1224 (M.D.N.C.1996).

Defendants agree this is the appropriate test but claim that after applying it, Ohio law wins out. "Under the significant relationship test we consider where the relationship between the parties was created and where it was centered." *New England Leather*, 942 F.2d at 256. The joint venture agreement provides it was entered into in Ohio. Plaintiff operated as a sole

proprietor but AMA was an Ohio non-profit corporation. Plaintiff has always been a North Carolina resident and always operated his business from his North Carolina office. During the joint venture period, he also operated the joint venture from North Carolina. Plaintiff managed all classes of the races, including those of AMA, processed pre-entries, sold sponsorships, processed racing licenses and collected entry fees and applications from his North Carolina office despite the fact that the races at issue occurred at various locations throughout the country. And, Plaintiff, a North Carolina resident, has been harmed by the conduct at issue. *New England Leather, supra.* The Court finds the North Carolina unfair trade practices statute should apply.

██ The second prong of the Defendants' attack on the cause of action for unfair competition is based on *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331 (4th Cir.1998). In that case, the owners of Meineke franchises sued the company for misusing funds collected from each franchisee for advertising. The franchisees paid weekly revenues to the company for local and national advertising but learned that funds were dispersed from the advertising account for items having nothing to do with advertising. When a class of franchisees brought suit, they alleged breach of contract, claims in tort and a cause of action under the North Carolina Unfair Trade Practices Act, (UTPA) N.C. Gen.Stat. § 75–1.1, *et seq.* The Fourth Circuit found that the plaintiffs could not pursue a claim for unfair trade practices because the essence of their claim arose out of a contract dispute. " 'The courts differentiate between contract and deceptive trade practice claims, and relegate claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement to the arena of contract law.' "

*Broussard,* 155 F.3d at 347 (quoting *Hageman v. Twin City Chrysler–Plymouth, Inc.,* 681 F.Supp. 303, 306–07 (1988)). While plaintiffs claimed the use of the funds in the account for items other than advertising was improper, the defendant claimed its interpretation of the franchise agreements allowed such use. The parties were still involved in a contractual relationship and whether or not the funds were in fact misused centered on an interpretation of the contract.

Such is not the case at hand; the dispute is not centered in an interpretation of the joint venture agreement or the parties' performance thereunder. The acts found by the jury, with one exception, occurred after the contractual relationship between the parties had ended. Plaintiff's suit is centered on AMA's conversion of his company, CCS, the assertion of control over the assets he brought to joint venture (which one member of the Board of Trustees threatened to take without compensation), AMA's misrepresentation of an intention to purchase his interest in the joint venture, its marketing and promotion of races in 1995 as if AMA had taken over the Plaintiff's business, a misrepresentation that the races promoted in 1995 were a continuation of the joint venture which had in fact ended, and AMA's interference with the Plaintiff's contractual relationships in 1995. These acts do not derive from and are not centered in the parties' defunct contractual relationship. Moreover, the dispute between the parties is not simply one of contractual interpretation but involves conduct by AMA outside of and after the termination of the contract. Nor is it merely a dispute concerning the performance of the contract.[4] *See, e.g., United Laboratories, Inc.,* 322 N.C. at 664–65, 370 S.E.2d at 389 (tortious interference with contracts and disputes between competitors violate the UTPA); *Ke-*

4. On this issue, the Court would concede that the jury's finding that AMA failed to disclose the terms of its television coverage contracts would fall within the perimeters of contract performance. However, the jury made specific findings that the above described conduct occurred, all of which support a claim under the North Carolina statute.

*waunee Scientific Corp. v. Pegram,* 130 N.C.App. 576, 503 S.E.2d 417 (1998) (fraud is a basis for a violation of the UTPA); *Edwards v. West,* 128 N.C.App. 570, 574–75, 495 S.E.2d 920, 924 (Fraud in a commercial setting falls under the statute; " '[a] party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position.' "), *cert. denied,* 348 N.C. 282, 501 S.E.2d 918 (1998); *Southern Bldg. Maintenance v. Osborne,* 127 N.C.App. 327, 489 S.E.2d 892 (1997) (continuing to interfere with contractual relationships while negotiating a settlement with the current owner of those contracts constitutes an unfair and deceptive trade practice); *Drouillard v. Keister Williams Newspaper Services, Inc.,* 108 N.C.App. 169, 423 S.E.2d 324 (1992) (conversion of customer lists violates the UTPA), *review denied,* 333 N.C. 344, 427 S.E.2d 617 (1993); *McDonald v. Scarboro,* 91 N.C.App. 13, 370 S.E.2d 680 (inducing the breach of a contract falls under UTPA), *review denied,* 323 N.C. 476, 373 S.E.2d 864 (1988). The Defendants' argument based on *Broussard* is rejected.

**G. Remaining grounds urged.**

The Court finds the Defendants' arguments that Plaintiff's counsel made inappropriate remarks during closing arguments, that evidence involving Plaintiff's bankruptcy proceeding and failure to direct verdict for Paradama Productions are without merit. Defendants take issue with the format of the Issues and the jury instructions given. The Court instructed the jury on the essential elements of each cause of action. However, the verdict sheet did not contain a separate finding by the jury as to each essential element, with the exception of the claim under the UTPA. Defendants' argument that this constituted error is also without merit.

Nor does the Court find the jury's verdict inconsistent. Moreover, even if it could be found to be inconsistent, under the prevailing standard the verdict is easily reconciled.

**H. Conclusion.**

The Court finds the jury's verdict is supported by the substantial weight of the evidence. It does not find the verdict to be against the clear weight of the evidence, based on false evidence or results in a miscarriage of justice. The damages awarded are supported by evidence and remittur is not appropriate.

**III. ORDER**

**IT IS, THEREFORE, ORDERED** that the Defendants' motions for judgment as a matter of law, for a new trial and in the alternative for remittur are hereby **DENIED.**